[L. A. No. 15223. In Bank.—June 30, 1936.]

PAUL B. HAMMOND et al., Petitioners, v. CITY OF BURBANK (a Municipal Corporation) et al., Respondents.

E. C. Pyle and Chas. L. Childers for Petitioners.

Robert H. Dunlap, George R. Larwill, Victor Ford Collins and Dryer, Castle & Richards, as *Amici Curiae* on Behalf of Petitioners.

Ralph W. Swagler, City Attorney, William Mackenzie Brown, Leon T. Davis, James H. Mitchell, Everett W. Mattoon, County Counsel, and J. H. O'Connor, Assistant County Counsel, for Respondents.

Coyle E. Bybee, City Attorney (Chico), M. Tellefson, City Attorney (Culver City), J. E. Greene, City Attorney (Dinuba), Eugene Best, City Attorney (Elsinore), Clyde Woodsworth, City Attorney (Cities of El Segundo, Inglewood, Manhattan Beach and South Gate), Aubrey N. Irwin, City Attorney (Glendale), Milburn G. Harvey, City Attorney (Laguna Beach), Wm. H. Jennings, City Attorney (La Mesa), Ray L. Chesebro, City Attorney (Los Angeles), Louis H. Burke, City Attorney (Montebello), E. L. Maxwell, City Attorney (Mountain View), M. M. Myers, City Attorney (Oceanside), Harold P. Huls, City Attorney (Pasadena), George Wadsworth, City Attorney (Tracy), and Lloyd Hewitt, City Attorney (Yuba City), as *Amici Curiae* on Behalf of Respondents.

SHENK, J.—Petitioner Hammond and other holders of improvement district bonds which are all past due and payable, seek by this proceeding in *mandamus* to compel the city authorities to levy and collect a special tax on all of the taxable property of the city, and to pay the proceeds thereof into certain bond redemption funds, so that the principal and interest due on petitioners' bonds may be paid in full. The matter is submitted on the petition and two returns to the alternative writ, and on a stipulation of the facts. There is also a motion to quash. This proceeding requires a further interpretation of the provisions of the Improvement Bond Act of 1915 (Stats. 1915, p. 1441, as amended), and particularly of sections 12 and 16 (a) thereof. These sections have recently been the source of much litigation, and many of the problems herein presented have been passed upon in the cases of *American Co.* v. *City of Lakeport*, 220 Cal. 548 [32 Pac. (2d) 622]; *Union Safe Deposit Bank* v. *City of Menlo Park*, 3 Cal. (2d) 264 [43 Pac. (2d) 811]; *Southern Califor-*

*nia Roads Co.* v. *County of San Luis Obispo,* 4 Cal. (2d) 220 [48 Pac. (2d) 34] ; *Griffith Co.* v. *County of Los Angeles,* 4 Cal. (2d) 222 [48 Pac. (2d) 35] ; *Sawyer* v. *County of San Luis Obispo,* 4 Cal. (2d) 776 [48 Pac. (2d) 35] ; *Thompson* v. *City of La Mesa,* 9 Cal. App. (2d) 542 [50 Pac. (2d) 504].

The City of Burbank, in December, 1924, by resolution passed pursuant to the provisions of the Improvement Act of 1911 (Stats. 1911, p. 730, as amended) provided for the improvement of part of Grinnell Drive, and parts of other streets in the city, and, as provided in the act, fixed the boundaries of the assessment district to be created to pay for the improvement. But one resolution of intention in reference to the entire improvement was passed, and all of the work was let under one contract. After the work was partially completed the contractor, acting in accordance with the provisions of section 30 of the 1911 act, in order to obtain a portion of the moneys due him, requested a partial assessment. Pursuant to that section the city council took the necessary steps to create an assessment district and to levy a partial assessment thereon, and bonds were thereupon issued. The bonds representing the partial assessment were in the total amount of $210,350.68, payable in ten equal instalments, with interest at 7 per cent, payable semi-annually, the last instalment of principal and interest falling due July 2, 1935. These bonds will hereafter be referred to as "Series VI bonds". Upon the completion of the contract proper steps were taken to levy a final assessment to pay for the balance of the work. Bonds were thereupon issued in the amount of $311,355.34, hereafter referred to as "Series VII bonds". As to rate of interest and time of instalment payments, these bonds were identical with the series VII bonds. Both series of bonds were issued under the provisions of the 1915 Bond Act.

According to the stipulated facts, beginning with the fiscal year 1925–1926, and continuing for each year thereafter, both sets of assessments became delinquent, and the properties upon which such assessments became partially delinquent were from time to time sold at tax sales, and the City of Burbank became the purchaser thereof.

Petitioners, exclusive of interest, in the aggregate hold series VI bonds in the total amount of $59,675.38, and series VII bonds in the total amount of $51,042.16.

The City of Burbank has at all times paid into the proper redemption funds all assessments paid by the property owners, and all redemption moneys, but has transferred no other city funds to the bond redemption funds, nor has the city at any time levied any special tax on all of the taxable property in the city for the purpose of raising funds to feed the redemption fund.

No payments of principal or interest on either series of bonds have been made since early in 1931; and since August, 1931, a restraining order has prevented any such payment. On May 13, 1935, in the redemption fund for series VI bonds there was $42,375.26, and for series VII bonds, $31,442.06. In addition there is on deposit with the superior court $26,259.68, taken from the series VI fund pursuant to a court order in another action. There is also an advanced maturity fund for series VI bonds of $2,870.69, and for series VII bonds of $2,727.57.

In August of 1932 the tax collector made his first demand that the city provide funds for payment of delinquent assessments and interest, as provided in the 1915 Bond Act, either by transfer of general funds to the redemption funds, or by the levy of a special tax as provided in section 16 (a) of that act. Demands were likewise made each subsequent year. No action was taken by the city authorities in reference to these demands.

There is other litigation pending in reference to these bonds. In *Weiczorek* v. *City of Burbank et al.,* the plaintiff is seeking in the estate courts to recover principal and interest on some series VI bonds, all past due, and to secure priority of payment from the redemption fund. Plaintiff in that action is also seeking to secure a judgment against the city and against certain city officials. Most of the petitioners in the present case have intervened in the Weiczorek case. In the federal courts there are pending two actions in equity brought by the Brown-Crummer Investment Company of Kansas against the city and its officials. The plaintiff in those cases is the holder of series VII and series VIII bonds of the City of Burbank, the last series not being directly involved in the present proceeding. Petitioners herein, by leave of court, have intervened in the federal court actions.

The Lakeport case was finally decided in April of 1934. Immediately thereafter, negotiations between counsel for the

city, counsel for Brown-Crummer Investment Company, and counsel for petitioners were undertaken, in an attempt to satisfactorily settle the differences between the parties. An agreement was reached which required the approval of the electorate for a proposed bond issue. The bond issue was defeated in November, 1934. The city attorney renewed negotiations, and caused the question of the bond issue again to be submitted to the voters in December of 1935, but the vote was again adverse. This petition was filed in March of 1935.

Some further facts concerning the two series of bonds should be given for a full understanding on the contentions made. As of July 2, 1935, the final maturity date of the bonds, on principal there was due $141,675.44 on series VI bonds, and $217,542.16 on series VII. Considerably over $100,000 interest is due the bondholders. Taking into consideration the fact that there is about $100,000 in the two redemption funds, there is a balance of over $350,000 due the bondholders. The assessed value of all the taxable property in Burbank is about $17,000,000, so that a ten-cent levy on each $100 of assessed value, without allowing the usual ten per cent for delinquencies, would raise but $17,000. The interest alone on the balance due the bondholders is about $25,000 per annum, so that one annual ten-cent levy will not pay the yearly interest.

The first major contention of petitioners is that they are entitled to a tax levy, limited only by the ten-cent provision of section 16 (a) of the 1915 Bond Act, to pay the "delinquent principal and interest on their bonds"; that the duty to levy such an assessment is "a continuing duty"; that the failure of the city council to make the levy in the years when it should have been made cannot affect petitioners' rights; that the levies that should have been made in past years should now be pyramided, and all levied this year.

In their first brief filed herein petitioners frankly requested the court to hold that the bonds constitute, in effect, a general obligation of the city, and thus to overrule the Lakeport case. Since the first brief was filed, the court has rendered decisions in the other cases cited *supra*, affirming the Lakeport decision. In their more recent briefs the petitioners practically concede, in view of the above cases, that the bonds are not "general obligations of the city in the usual acceptation of the term

'general obligations' '', but contend that they are "nevertheless general obligations to the extent of the limited amount of moneys the city must pay on account thereof as provided by statute''. It seems to be petitioners' position that the ''limited'' obligation of the city is to levy a special tax, and that the money so collected should be used to pay overdue principal and interest on the bonds, and that this duty continues as long as the bonds remain unpaid. In other words, while admitting that the levy must be limited to ten cents per year for each improvement, petitioners contend that the past due principal and interest is a general obligation of the city, and that the city by failing to make past levies cannot escape the liability therefor. It is their contention, therefore, that this year the city must cumulate all the ten-cent levies it should have made in the past, and must levy this year the total amount of all these levies. It is also petitioners' position that each series of bonds represents a separate improvement (a contention later to be considered) and therefore separate ten-cent levies must be pyramided for each issue of bonds. This contention is based on the premise that the city, limited only by the ten-cent provision, is ultimately liable for all of the delinquent interest and principal on the bonds.

The ultimate effect of petitioners' contention would be to impose a ruinous rate of tax on the property owners of the city. To illustrate: If the delinquencies for each series of bonds exceeded each year since 1925–1926 the amount that could be raised by a ten-cent levy, since ten such years have passed, petitioners' contention would require that this year they are entitled to have the past years' levies cumulated, and therefore the city must levy a $1 tax for each series of bonds, or a $2 levy for both series. The city has eight such series of bonds outstanding, and now delinquent, and if all such bonds are delinquent to the extent assumed in this illustration, if petitioners are correct, the bond owners could compel an $8 levy this year. If we further assume for the purposes of illustration that the city and county rate of taxation for general purposes is $4, it would mean that this year each taxpayer in the city of Burbank would have to pay a tax of $12 per hundred dollars of assessed valuation on all property owned by him. This extremely high rate of taxation would undoubtedly result in a very high rate of delinquency.

The basic objection to petitioners' position is that the bonds are in no sense general obligations of the city. The city itself is not obligated to pay the delinquent interest and principal on the bonds. This conclusion necessarily follows from the express terms of sections 12 and 16 (a) of the 1915 Bond Act as interpreted in the Lakeport and other cases cited. So far as pertinent here section 12 provides that the assessments levied on the lands within the assessment district shall be levied and collected with the general municipal taxes; that "upon default in payment, the lands securing such . . . assessments shall be sold in the same manner in which real property in such city is sold, for the non-payment of general municipal taxes, and be subject to redemption within one year from date of sale . . . , and upon failure of such redemption shall in like manner pass to the purchaser"; that the city may be the purchaser at the delinquent tax sale, "and in the event of its becoming the purchaser shall pay and transfer into said redemption fund the amount of the delinquent assessment and of the delinquent interest thereon upon which said sale is made"; that where there is no other purchaser the city shall become the purchaser at the sale; that in the event there are not available funds in the city treasury to pay for such purchase, the tax collector shall delay the entry of the certificate of sale until such funds are available, making demand upon the city council that "a suitable amount" be included in the next tax levy "for the purpose of providing funds with which to make such payment"; that in the event the city becomes the purchaser, and a succeeding instalment of the assessment is not paid, or interest is not paid, the property "shall not be sold again," unless there has been a redemption, but the city shall "from time to time when due pay and transfer into said redemption fund the amount of any such future delinquent assessment and interest pending redemption". It is to be noted that although section 12 provides for a demand for a tax levy for a "suitable amount" to pay for land purchased at delinquent tax sale, it does not provide how the funds are to be obtained to pay for subsequent instalments after the city has purchased. Reading section 12 alone it would appear that the city is under a duty to pay delinquent interest and principal on the bonds. This was the holding in the first decision in the Lakeport case. Upon rehearing, however, it was held

that as far as the duty of the city to levy taxes was concerned, such duty was prescribed and limited by section 16 (a) of the act. So far as pertinent here that section provides: ''The city council may, and in the event of demand by the tax collector therefor as provided in section twelve hereof must, at the time of fixing the annual tax rate and levying the taxes to be collected for general municipal purposes, levy a special tax upon the taxable property in the city for the purpose of paying for the lands purchased or to be purchased at such tax sales, but not to exceed for each local improvement ten cents on each one hundred dollars of assessable property.'' As indicated in the Lakeport case, the proper interpretation of these two sections is not free from difficulty. Section 12 provides that the city not only shall purchase at all delinquent tax sales, but shall also pay all subsequent instalments falling due on the lands so purchased. Section 16 (a), however, authorizes the city to make but a ten-cent levy and furthermore expressly states the purpose for which this levy is to be made, i. e., ''for the purpose of paying for the lands purchased or to be purchased at such tax sales''. In the Lakeport case it was determined that section 16 (a) was the only section imposing a mandatory duty on the city to levy a tax, and that this section constituted a limitation on section 12. It was further held that although section 12 provides for a demand for a tax levy, it did not empower the the city to make a levy for the purposes therein specified. To use the exact language of the Lakeport case, appearing at page 564: ''It will be observed that this section provides for a *demand* for a tax levy, but not for a tax. The section gives no authority to the city council to levy any tax.'' It was pointed out that it may seem unreasonable to require the city to purchase and to pay delinquent assessments, and yet not to provide a means of payment, but from this fact the power to levy a tax may not be implied. ''But the imposition of a tax by inference or implication, no matter how logical or reasonable it may seem, is universally condemned by the authorities, which lay down the rule that the tax must be based upon an express statutory authority, and that doubts will be resolved against the taxing power.''

▉ It must now be taken as settled, not only by the Lakeport decision, but also by the other cases subsequently decided, that section 16 (a) is the only section imposing a man-

datory duty to levy a tax, and it must necessarily follow that since that section provides the purpose for which that tax may be levied, that that purpose is exclusive, and that the city cannot be compelled to levy a tax other than as in that section provided.

Under this interpretation it is obvious that petitioners' contention that the act provides for a flat limited guaranty for the full payment of the bonds cannot be sustained. All the act provides, so far as the mandatory duty of the city is concerned, is that the city create a revolving fund to assist in the purchase of the lands sold at delinquent tax sales. After referring to the two sections, this court in the Lakeport case stated that ''the method employed by our statute is in effect an *advancement* of funds, which the city may normally be expected to recover upon resale of the lands secured at the delinquent sales'' (220 Cal., at p. 562) ; in other words, the statute does not provide for any guaranty by the city but merely a loan of funds. (See, also, *City of Pasadena* v. *McAllaster,* 204 Cal. 267 [267 Pac. 873] ; *Municipal Imp. Co.* v. *Thompson,* 201 Cal. 629 [258 Pac. 955].) Petitioners strongly rely on certain language appearing in some of the cases such as: There is a mandatory duty on the part of the city ''to levy and collect said tax to pay the principal and interest on said bonds'' (*Union Safe Deposit Bank* v. *City of Menlo Park, supra,* p. 266) ; a mandatory duty exists ''to pay overdue principal and interest on the bonds'' (*Southern Calif. Roads Co.* v. *County of San Luis Obispo, supra,* at p. 165) ; and similar language appearing in the other cases. These generalizations are not to be given the effect contended for. Although, in a general sense, it is true that the money raised by the ten-cent levy goes into the bond redemption funds, and so is ultimately applied to payment of the principal and interest on the bonds, the duty to levy the tax, under section 16 (a), is not directly for that purpose but for the sole purpose of ''paying for the lands purchased . . . at such tax sales''. The general language used in the above cases was never intended to mean, and when read in connection with the points there under discussion cannot be interpreted to mean, that the city is obligated to levy taxes to pay for the principal and interest on the bonds. Such an interpretation would be entirely contrary to what was held in the Lakeport case. The city undoubtedly has

the power to transfer any available funds to the bond redemption funds, and unquestionably has the power to make the ten-cent levy in order to build up a fund to purchase lands at delinquent sales, but it can only be compelled to make the levy to raise money to pay for lands purchased at such sales, and for no other purpose.

We are further of the opinion that the obligation of the city enforceable in *mandamus*, as distinguished from the power of the city, which may or may not be exercised in the discretion of the city council, is limited by the provisions of section 16 (a) to a special ten-cent levy in any one year. That section is in the nature of a tax limitation statute and applies to the levy in the year for which it is made. The fact that a levy in that amount, or any amount, has not been made in former years does not justify a violation of the plain tax limitation provision. True, the duty to levy the tax is a continuing one so long as the obligation to levy the same is shown to exist, but that continuing duty is always subject to the limitation thus imposed. No case involving this statute has authorized a departure from this limitation. It must be held, therefore, that the pyramiding of the levies to cover what might have been raised in former years in such a way as to cause the special levy in any one year to exceed ten cents for each local improvement cannot be approved.

From what has been said it is quite apparent that petitioners are entitled this year to a ten-cent levy for each local improvement, unless the defenses urged by the city and its officials in their respective returns are sound.

Respondents urge that if it be determined that the bonds do not constitute a general obligation of the city and that the funds raised by the ten-cent levy constitute but advancements to the bond redemption funds, then the liability of the city is necessarily predicated upon there first being held a *valid* tax sale. It is respondents' theory that in the event the city purchases at the delinquent tax sale, the statute contemplates that the city will acquire a valid title to the property so purchased, which it may thereafter dispose of, and so recoup the advances made to the bond redemption fund. It is further contended that the purported sales to the city in the present case were in fact invalid, for the following reasons. Municipal taxes are collected in Burbank by the county tax collector, pursuant to the provisions of the law permitting

this delegation. Section 12 of the 1915 Bond Act provides that upon default the lands securing the instalments "shall be sold in the same manner in .which real property in such city is sold, for the nonpayment of general municipal taxes, and be subject to redemption within one year from date of sale in the same manner as such real property is redeemed from such delinquent sale, and upon failure of such redemption shall in like manner pass to the purchaser". The minimum period of redemption upon sales for general taxes is five years (Pol. Code, secs. 3764, 3771, 3771a, 3785 and 3817). In the present case the county tax collector published but one notice of sale and held but one sale, in which the special assessment charges were consolidated with all of the general charges due upon the land for all levies. No segregation was made between the various items composing the total of the charges, and no detailed statement was made of all the delinquent taxes, penalties and costs, interest, graduated penalties and expenses up to the date of sale. It is respondents' contention that such lump sales were invalid, under the provisions of Political Code, section 3897, as it read at the time these sales were had, and as interpreted in *Cordano* v. *Kelsey,* 28 Cal. App. 9 [151 Pac. 391], and *Gottstein* v. *Kelly,* 206 Cal. 742 [276 Pac. 347]. We do not find it necessary to now pass upon the question of the validity of the tax sales. The prior decisions of this court have definitely determined that this question cannot be litigated in this type of proceeding. In determining the extent of the mandatory duty imposed upon the city by section 16 (a) of the 1915 act, we cannot go into the question as to whether the agents of the city have properly performed their respective duties in conducting the sales. That issue is entirely immaterial in the present proceeding.

In *Southern California Roads Co.* v. *County of San Luis Obispo, supra,* the same general question was raised and disposed of as follows: "Respondents also suggest that the statutory procedure by which the properties of persons delinquent in their assessments are sold to the state for the benefit of the county is confused, and does not protect the rights of the county. Specifically it is contended that since the statutes provide different periods of redemption from sales of property for delinquent assessments and delinquent general taxes, a separate sale must take place for each

type of delinquency, and no such separate sales were had in this case. We express no opinion on respondents' interpretation of that part of the statute. A discussion of that procedure is wholly irrelevant in the present proceeding, which seeks to enforce a clear mandatory duty imposed by the statute.''

In another case decided the same day as the one just quoted from—*Griffith Co.* v. *County of Los Angeles, supra*—the court further elaborated on the same principle as follows: ''The respondent county herein argues that unless there are separate sales for delinquencies in assessments and general taxes, its liability does not exist. As we pointed out in *Southern California Roads Co.* v. *County of San Luis Obispo, supra,* the mandatory duty to levy the special tax is not affected by the procedure followed in sales for delinquencies, and it is accordingly improper in this proceeding to attempt to set forth the construction of the statutory provisions governing such sales.'' See, also, *Clayton* v. *Schultz,* 4 Cal. (2d) 425 [50 Pac. (2d) 446], discussing the legal effect of certain 1929 amendments to the tax sale provisions of the Political Code (Stats. 1929, p. 742).

The next defense of respondents is based on the fact that in reference to certain of the delinquent properties the city has instituted foreclosure proceedings under section 11 of the 1915 Bond Act. It is contended that the remedy of foreclosure is an alternative remedy (although section 11 expressly states the remedy is cumulative) and that once resorted to the foreclosure proceedings supersede proceedings had under sections 12 and 16 (a). In 1929 the city started proceedings leading to its foreclosure of the assessment liens on 326 lots then delinquent. Thirty-six actions affecting 269 lots, and thirty-eight actions affecting 57 lots, were filed in November, 1930. The thirty-six actions proceeded to judgment, which judgments have long since become final. The thirty-eight actions have never been prosecuted to judgment. But one sale was ever held under these judgments, and that was a sale of one lot to test the proceedings. It is practically conceded that the holding of foreclosure sales would be an idle gesture, inasmuch as the cost thereof would be prohibitive, and because it is extremely unlikely that purchasers could be found.

Even if it be held that the remedy by foreclosure is an alternative remedy, it does not appear just how the proceedings above described would affect petitioners' rights in the present proceeding. There are about 800 lots now delinquent within the district. The city has either prosecuted to judgment or started foreclosure actions against but 269 lots. Even if the city were relieved as to those 269 lots, there is no showing that the ten-cent levy is not necessary to pay the purchase price of the balance of the lots. It should be added that the foreclosure proceedings did not stop the tax sales under section 12—they were held just the same.

Moreover, we are not called upon in this proceeding to determine the rights of the city under section 11 of the act. The remedy of foreclosure, in our opinion, is not an alternative but a cumulative remedy, and is a remedy given to aid the city, not the bondholders. Any other interpretation of the foreclosure provisions would permit the city by purported foreclosure actions to totally escape the mandatory duties imposed upon it under section 16 (a), even where, as here, it is known by all concerned that such foreclosure actions will not result in an actual sale of the property. In discussing this general proposition in the Lakeport case, the court at page 562 used the following language which we think is decisive of the present contention:

"We now come to the final problem, that of interpretation of sections 11, 12 and 16 of the statute, and the relation each bears to the others. It is first contended by respondents that there is no mandatory duty to levy taxes under sections 12 and 16, since the city may, at its election, proceed to foreclose under section 11 (c). The answer to this is found in the statute itself, which expressly declares the provision for foreclosure to be a cumulative remedy. It is different in character and procedure, and is slower, more expensive and less efficient than the tax sale. While it may perhaps be resorted to either before or after a tax sale, the commencement of foreclosure proceedings cannot, under the act, be deemed an excuse for nonperformance of any duty under sections 12 and 16, to levy taxes to pay for property purchased. Under section 12 the city, through the agency of the state, becomes the real purchaser of the property at the sale. It thereupon becomes the duty of the city, as such purchaser, to pay the amount of the assessment into the redemption fund; and if it

has no funds with which to do so, then the taxing provisions are applicable. We find no merit in this point.''

It may be that when foreclosure proceedings are instituted and proceed not only to final judgment, but also to sale, then the city may be relieved of liability (*Federal Construction Co. v. Wold*, 30 Cal. App. 360 [158 Pac. 340]), a point we expressly refrain from deciding, but the foreclosure provisions were never intended, in our opinion, to constitute an alternative method of procedure so that the city by the mere commencement thereof, or by proceeding to judgment therein, should be entirely relieved of its mandatory obligation to make the ten-cent levy under section 16 (a).

Petitioners further contend that in addition to the ten-cent levy, they are entitled to have raised by a general tax the amount of certain surpluses which they allege existed in past years, and which, it is stated, the city should have used but did not use to feed the redemption funds. The petitioners state that in nearly every year since 1925 to date there existed a surplus in various funds of the city, including the general fund. It is their contention that these surpluses should have been applied to the purposes set forth in section 12; that not having been so applied the city is bound to replace these surpluses by a fund raised by general taxation, and that the duty to raise this fund may be enforced by *mandamus*.

There can be no doubt that the city has the power to apply funds beyond the ten-cent limit for the purpose set forth in section 12, including the payment of future delinquencies after the city has purchased the property at delinquent tax sale. That this power exists was clearly recognized in the Lakeport case, where it was also at least intimated that the city not only had this power, but could be compelled to transfer surpluses to the bond redemption fund for the purposes of carrying out the city's obligations under section 12. After pointing out the apparent inconsistency between sections 12 and 16 (a), in that section 12 places many obligations on the city, while section 16 (a) limits the mandatory duty to levy taxes to ten cents per hundred dollars of assessed valuation, the court stated at page 565:

''Thus, where there are ample funds in the treasury, previously raised by tax action, the whole of the delinquent assessment must be paid out of such funds, section 12 pro-

viding that the city 'shall pay and transfer into said redemption fund the amount of the delinquent assessment and of the delinquent interest thereon'; but if the treasury is depleted, only the ten-cent levy under section 16 (a) · can be made; with the result that the immediate payment in full of the delinquent assessments, a duty resting upon the city under section 12, is dependent upon the fortuitous circumstance that money is in the treasury and available at the time of purchase. But upon reflection, this is not wholly unreasonable. It may well be that the city should be required to meet its obligation under the statute in full with available funds, if they are sufficient in amount, but that it should not be forced to meet it, when sufficient funds are not available, by a ruinous tax. Such a distinction would well have been within the contemplation of the legislature, and the alleged inconsistency constitutes no fundamental objection to the construction we have adopted.''

We may assume that in any year if there is a surplus ''previously raised by taxation'', the bondholders can compel by *mandamus* a transfer of that surplus to the bond·redemption funds for the purposes specified in section 12. That relief, however, is not available to petitioners in the present case for at least three reasons:

In the first place, the stipulated facts demonstrate that there was no available surplus when the petition herein was filed, it being admitted that in June of 1934 the general fund was in fact indebted in the sum of $96,000 to another fund for moneys borrowed therefrom. The moneys in the creditor fund, under the city charter, are not available to the general fund. It therefore follows that when this petition was filed there was no surplus ''previously raised by taxation'', available for transfer.

In the second place, the record herein does not show that there was a surplus in any year between 1925 and 1934. In the stipulated facts it is stated that as of June 30th of each year since 1926 to June 30, 1934, there were certain balances in the general fund, the public service fund, and other funds, which balances are set forth in detail. These balances, however, do not necessarily represent a surplus in the hands of the city over and above the governmental liabilities incurred in the particular fiscal year in which these balances existed. In other words, the figures stipulated to

represent nothing but bank balances as of a particular date. It is admitted that in computing these alleged surpluses the parties did not give any consideration to outstanding governmental obligations, incurred during the particular fiscal year, which were a charge upon these funds. The stipulation expressly provides: ''That each of the June 30th balances set forth above were chargeable with unpaid governmental expenses incurred in the fiscal year for which the balances are shown.'' The amount of these unpaid charges is not shown.

█ In the absence of proof to the contrary we must assume that moneys collected for any fiscal year were expended in payment of municipal demands which accrued during the year. (*Stuart Arms Co.* v. *San Francisco,* 203 Cal. 150 [263 Pac. 218].) The mere existence of a bank balance as of a certain date does not prove, even indirectly, that as of that date there was a surplus. Whether, in any year, the city had a surplus previously raised by taxation available for the purposes specified in section 12, depends upon pleading and proof that there was a balance in the general fund, after deducting all outstanding bills due and unpaid, and after deducting all other lawful obligations of that fund. Petitioners have not pleaded the necessary facts, and by their stipulation have necessarily demonstrated that their position on this point is untenable.

█ In the third place, even if there had been a surplus in 1926 and some of the succeeding years, and assuming the transfer of that surplus to the redemption funds could have been enforced by *mandamus* in those years, we have grave doubts as to whether that remedy is available to petitioners at this late date. Under elementary principles, if there was an excess for any of these past years, the presumption is that it was carried over into the next year and entered into the computation of the rate for the following year. (*Stuart Arms Co.* v. *San Francisco, supra.*) It would be quite unfair to the taxpayers of Burbank to permit the petitioners to sit back for eight or nine years and allow surpluses, that under this theory should have been transferred to the bond redemption fund, to be consumed in later years for other purposes, and then to compel the city this year to raise by general taxation the total amount of such surpluses so consumed. The petitioners have slept on their rights for these many years and their laches bars them from this relief at this late date.

The last point necessary to discuss is whether series VI and series VII bonds represent two local improvements, or but one. Section 16 (a) above quoted provides that the city council shall make the tax levy, "but not to exceed *for each local improvement* ten cents on each one hundred dollars of assessable property". The question presented is as to the meaning of the phrase "each local improvement". This in turn depends upon whether, when partial assessments are levied under section 30 of the 1911 act, and separate assessment districts created and separate issues of bonds authorized, each district so created constitutes one improvement, or whether all districts created by virtue of one resolution of intention constitute but one "local improvement". We think that there is no reasonable doubt as to the proper solution of this problem.

According to the stipulation of the parties, the city, pursuant to the proper provisions of the 1911 act, passed its resolution of intention to improve Grinnell Drive, and certain parts of other streets. Throughout this resolution the proposed project is referred to as the "work and improvement". In this resolution of intention the city council defined the district benefited by the improvement and stated that said "district is hereby declared to be the district benefited by said work and improvement and which shall be assessed to pay the cost and expense thereof".

Subsequently one contract was let to do the entire work After the contractor had performed a portion of the work, pursuant to section 30 of the 1911 act, he requested a partial assessment. Section 30 provides: "The city council, instead of waiting *until the completion of the improvement*, may, in its discretion, and not otherwise, upon the completion of two blocks or more *of any improvement*, order the street superintendent to make·an assessment for the proportionate amount of the contract completed, and thereupon proceedings and rights of collection of such proportionate amount shall be had as provided in the preceding sections." The city council levied a partial assessment on part of the district described in the resolution of intention, and as a result thereof series VI bonds were issued. When the work was completed, another partial assessment was levied on part of the lands described in the resolution of intention, and as a result thereof series VII bonds were issued. The partial and final

districts do not cover the same properties, and the two districts overlap to some extent. When the partial and final districts are considered together, the lands included therein constitute the lands within the original district described and created in the basic resolution of intention.

Under the 1911 act a city could include in one resolution of intention the improvement of several streets, and the doing of several types of work. In such event, the entire improvement is a unit, and must be let under one contract. (*Remillard* v. *Blake & Bilger Co.*, 169 Cal. 277 [146 Pac. 634, Ann. Cas. 1916D, 451], interpreting a similar section of the Vrooman Act, Stats. 1885, p. 147; see, also, 19 Cal. Jur., p. 234, sec. 560 et seq., and cases there cited.) In *Treanor* v. *Houghton,* 103 Cal. 53, 59 [36 Pac. 1081], in discussing provisions of the Vrooman Act similar to those found in the 1911 act, it was stated:

"The range of the district to be included in a single improvement, and the character of the work to be performed therein, within the specifications of the statute, is left to the judgment of the board. The resolution of intention must, however, define alike the limits of the district and the nature of the work to be done. The entire work thus described becomes a unit, a single enterprise, upon which the power of the board, subject to the rights of the property owners, is thereafter to be exercised. The statute in all its subsequent provisions deals with it as a unit, as a single improvement."

From the foregoing, and from a reading of all the provisions of the 1911 and 1915 acts, it seems clear that the resolution of intention contemplated and in fact provided for but one local improvement; and that the expression, "each local improvement", appearing in section 16 (a) of the 1915 act refers to the improvement—the work, the unit—provided for in the resolution of intention, and that the city council may be compelled on this proceeding to make but one ten-cent levy.

It follows that petitioners are entitled to a writ ordering the respondent officials, at the time of fixing the next tax rate, to include therein a ten-cent levy on all the taxable property in the City of Burbank, the sum so collected to be divided *pro rata* between the series VI and series VII redemption funds. The motion to quash is denied.

Let a peremptory writ of *mandamus* issue as above indicated.

Curtis, J., Seawell, J., Waste, C. J., Langdon, J., and Thompson, J., concurred.

Rehearing denied.