[Civil No. 3627.   Filed February 27, 1937.]

[65 Pac. (2d) 1154.]

J. E. WISE, as Mayor of the City of Nogales, and F. B. CARROON, LUIS ESCALADA, C. T. FRAZIER, E. A. WESSELL, LOUIS HUDGIN, and E. JAY DITTMER, as Members of the Board of Aldermen of the City of Nogales, Appellants, v. THE FIRST NATIONAL BANK OF NOGALES, a National Banking Association, Appellee.

Mr. James Y. Robins, former City Attorney, and Mr. Gordon Farley, present City Attorney, for Appellants.

Mr. Duane Bird and Mr. Thomas L. Hall for Appellee.

Mr. I. A. Jennings, City Attorney, Mr. Hess Seaman, Assistant City Attorney, Phoenix, Mr. B. G. Thompson, City Attorney, Tucson, Mr. E. Colman Gorman, City Attorney, Winslow, and Mr. A. Van Wagenen, Jr., City Attorney, Casa Grande, *Amici Curiae.*

LOCKWOOD, J.—■ This is an appeal from a judgment of the superior court of Santa Cruz county, directing J. E. Wise, as mayor of the city of Nogales, and F. B. Carroon, Luis Escalada, C. T. Frazier, E. A. Wessell, Louis Hudgin, and E. Jay Dittmer, as members of the board of aldermen of said city hereinafter called defendants, to include in their annual budget of the city for the fiscal year ending May 31, 1935, which we shall hereafter refer to as the current year, a sum of money to be determined by rules laid down in the judgment. It is admitted by the parties that the defendants have already complied with the order and judgment appealed from, and it was suggested that the questions involved in the appeal have become moot. It appears, however, from the record that the principles of law on which the judgment of the superior court was based may be questioned annually by subsequent litigation, and that almost every incorporated city and town in the state is vitally interested in the final determination of these principles, for the reason that until they are definitely settled many, if not most, of these municipalities will be seriously embarrassed in the raising of funds for the improvement of their streets. We have concluded, therefore, to disregard the suggested moot feature of the case, and consider the legal questions presented on their merits.

The facts necessary to a determination of the specific case and raising the legal questions to which we have referred are not in dispute and may be stated as follows: Between the years 1922 and 1930, the city of Nogales engaged in an extensive system of street improvements and issued bonds therefor in a total amount of $230,594.91. A large portion of these bonds were issued under the provisions of chapter 13, title 7, Revised Statutes of Arizona 1913 (section 1953 et seq.), as modified by chapter 144, Session Laws of 1919, and the amendments thereto, and are in the form prescribed by section 4 of the act of 1919. A smaller portion were issued under article 16, chapter 12, Revised Code of 1928 (section 511 et seq.), and are in the form prescribed by section 536 of that Code. The First National Bank of Nogales, a national banking corporation, hereinafter called plaintiff, was and is the holder of a large amount of the bonds referred to, which are payable in installments. Many of the bonds so owned both by the bank and by other parties were overdue as to the interest and one or more installments thereon, and default had been made in payment thereof, for the reason that the owners of the property against which the cost of the improvements aforesaid had been assessed had not paid their assessments as required by law. At the beginning of the current year, there was a deficit in the fund established by law for the payment of these bonds, amounting to something over $21,000, and it was estimated that if the property owners were delinquent during that year, as they had been in the past, the total deficit at the end of such year would amount to approximately $30,000. Between the year 1930 and 1934, there had been sold to the city, as provided by law, certain property on which the assessments were due and unpaid, for the amount of $6,797.86, but it had not paid the purchase price of said property in any manner.

On July 19, 1934, some six weeks after the beginning of the current fiscal year, the defendants met and adopted a tentative budget, as required by law, for the current year amounting all told, for the general fund, to the sum of $66,952.65. This amount was exactly 10 per cent. in excess of the expenditures for the preceding fiscal year from the general fund of the city. Among the items in the tentative budget, which included general government, health, police and fire protection, and others of the usual municipal expenditures, was one entitled, "Purchases of delinquent assessments," amounting to $721.42. At the meeting above referred to, when the tentative budget was adopted, plaintiff demanded of defendants that they budget a sufficient amount so that there could be appropriated out of the general fund of the city for the current fiscal year to the special fund established by law for the payment of street improvement bonds such amount as might be reasonably necessary to pay for any property which the city had purchased, or would be obliged by law to purchase on account of delinquencies of the property holders in their assessments for the street improvement bonds aforesaid, or, in lieu thereof, such amount as would be necessary to pay whatever unpaid and delinquent street improvement bonds and interest might exist during the current fiscal year. This the defendants failed and refused to do, and announced that on August 13th they would meet for the purpose of making their final budget. Thereafter and on August 7th, the plaintiff filed its petition in court praying that a writ of *mandamus* be issued to compel defendants to budget in accordance with the demands that had been made on them on July 19th. The alternative writ was issued and, after hearing, was made peremptory in the following language:

"Now, therefore, we, being willing that speedy justice should be done in this behalf, to-wit, the said The

First National Bank of Nogales, a national banking association, do command and enjoin you and each of you that immediately after the receipt of this writ you, and each of you, do place in said budget of the expenditures and tax levies estimated and proposed to be made, and of the receipts, from sources other than taxation, estimated to be received, by said City of Nogales for the now current fiscal year, that is, the year beginning June 1, 1934, and ending May 31, 1935, a sum or item for the general fund of the Treasury of · said City of Nogales sufficient in amount to enable the legislative body of said City of Nogales to appropriate from and out of such general fund to the said special bond funds the amount or amounts that heretofore had been bid by said City of Nogales to purchase any and all property assessed for said improvements and offered for sale by the Superintendent of Streets of said City of Nogales because of delinquency in the payment by the owners of such property of assessments, or installments thereof, for said several improvements and for which there had been or will be no purchaser or purchasers, or to enable said legislative body to direct the treasurer of said City of Nogales to pay out of said general fund into said special bond funds the sum or sums required to pay the said improvement bonds and interest that were due and unpaid at the beginning of the said current fiscal year and to pay the said improvement bonds and interest to become due during said current fiscal year as aforesaid for and in connection with said several improvements. . . . ''

Whereupon this appeal was taken.

The question before us is whether it was the duty of defendants to budget as aforesaid, and the answer will depend upon a construction of certain statutes of the state of Arizona, together with the Constitution of the state and the charter of the city of Nogales.

It is necessary in determining the question 'that we first review briefly the statutes of the state regarding street improvements. In the year 1912, chapter 55 of the First Regular Session of the First Legislature

was adopted, which set up a complete and comprehensive plan of street improvements for the municipalities of the state. It followed substantially the street improvement act of the state of California, generally called the Vrooman Act (Stats. Cal. 1911, p. 730), and its provisions may be summarized as follows so far as material to this case: The governing body of a municipality seeking to take advantage of the act was first required to pass a resolution of intention for street improvements. These improvements might be made solely at the cost of the city as a whole from the general fund, and in such case a certain procedure was to be followed. If, however, it was determined that the improvement was of more than local or ordinary public benefit, it might establish an improvement district, and unless a certain percentage of the owners of the property in the district protested within a time fixed by law, the governing body might order the improvement to be made. A contract was then let for the improvements, and the cost thereof was assessed against the property in the district in the manner set forth in the act. Serial bonds might be issued to represent the cost of the improvement, and these bonds followed a prescribed form, showing that they were a lien on the specific property in the amount fixed by the assessment against it. If the bonds were not paid, and the holder of the bonds so requested, the property was advertised and sold, as provided by law, and the money received therefrom paid into the fund used for the payment of the bonds and interest as due. The general funds of the city, in case a district was established as above set forth, were in no manner used for the payment of the bonds, nor was the city under any obligation of any kind to see that they were paid, except that when the holders of bonds demanded it, the city treasurer was required to sell any delinquent property and use the proceeds, so far as they were

sufficient, in payment of the bonds. Due to the fact that the purchaser of the bonds was under the necessity of, in substance, foreclosing separately his lien against each specific piece of delinquent property and that the city was under no obligation to care for any delinquency after such foreclosure, from its general funds, street improvement bonds were almost impossible of sale except at a ruinous discount, and the costs of improvements were thus extremely high, the burden eventually, of course, falling on the taxpayer who owned property in the district. A similar situation had arisen in California, and in 1915 (Stats. Cal. 1915, p. 1441) the Vrooman Act was amended by a provision which, in substance, made the municipality the guarantor to a certain extent of the street improvement bonds if, as, and when they become delinquent. Apparently, our legislature did not realize the necessity of amendment until 1919, but in that year it adopted chapter 144 of the First Regular Session of the Fourth Legislature, which entirely changed the method of handling delinquent assessments. This chapter was amended in 1925, and later revised as section 541, Revised Code of 1928. While the details are somewhat different, that part on which the issues of this case are based is so similar that except for one point, which we shall discuss separately, we shall assume that section 541, *supra,* was in force when all of the bonds involved herein were issued. This section reads as follows:

"§ 541. *Sale; city may purchase where no bidders.* On the day fixed for the sale, the superintendent must at the hour of ten o'clock, or any time thereafter to which the sale may be adjourned, begin the sale of the property advertised, commencing at the head of the list and continuing in the numerical order of lots, until all are sold; he may postpone or continue the sale from day to day until all the property is sold. Each lot separately assessed must be offered for sale sepa-

rately. The sale shall be for the entire assessment including the delinquent instalment, and the person who will take the least quantity of land and then and there pay the amount of the assessment, penalty and costs due, including fifty cents to the superintendent for a certificate of sale, shall become the purchaser. If there is no purchaser for any lot so offered for sale, the same shall be struck off to the municipality as the purchaser, and the legislative body shall appropriate out of the general fund of the treasury the amount bid for such purpose, and shall order the treasurer to place the same in a special fund for such improvement. The legislative body, however, may direct the treasurer to pay into said special fund only the sum required to pay the instalment then due or to become due upon the bonds issued for such assessment, and thereupon the municipality shall become obligated to pay out of the general fund of the municipality the succeeding instalments, and interest on said bonds, as are payable by the assessments on said lot. The municipality may sell any lot, so purchased after the expiration of the time for redemption, at public or private sale. All moneys received by the municipality from the redemption of property purchased by it and from the sale by it of property so purchased, less the amount theretofore paid into the special fund out of the general fund, shall be paid into the special fund for the payment of the bonds until said special fund is made sufficient to pay all outstanding bonds.''

We think it unnecessary to quote the California amendments of 1915 at length, but a careful comparison with section 541, *supra,* shows clearly that the central idea is the same, to wit, that in case the owner of the property against whom the assessment is levied does not pay it, the property shall be sold in the manner provided by law, and unless some other person will bid it in, the municipality must purchase it and thereafter raise money by general taxation to pay the delinquent assessments. Section 541, however, differs materially in form from the corresponding provisions of the California act of 1915, and is far more drastic

and mandatory in its terms, with one exception. That exception is that the California act explicitly directs the municipality to levy a special tax to pay the delinquent assessments, not to exceed a certain rate, while our statute commands an appropriation from the general fund of a certain sum and that the treasurer pay the appropriation to the special fund, but does not in so many words direct that a tax be levied to raise the general fund from which the appropriation is to be made. Defendants, as a matter of fact, do not seriously contend that section 541, *supra,* if constitutional and applicable to the present situation, does not require them to budget a sufficient amount so that the general fund may transfer to the special street improvement fund enough to pay for all the property which the city has actually bought in, but they urge that the section violates certain provisions of the Arizona Constitution and is in conflict with other provisions of our statutes, and the charter of the city of Nogales. We will consider these various contentions.

■■ The constitutional provisions which defendants claim apply are section 13 of article 7 and section 7 of article 9 of the Constitution of Arizona, which read, respectively, as follows:

"Questions upon bond issues or special assessments shall be submitted to the vote of property tax-payers, who shall also in all respects be qualified electors of the State, and of the political subdivision thereof affected by such question."

"Neither the State, nor any county, city, town, municipality, or other subdivision of the State shall ever give or loan its credit in the aid of, or make any donation or grant, by subsidy or otherwise, to any individual, association, or corporation, or become a subscriber to, or a shareholder in, any company or corporation or become a joint owner with any person, company, or corporation, except as to such ownerships as may accrue to the State by operation or provision of law."

Similar objections were made to the California statute based upon provisions of the Constitution of that state like in effect to those of ours just quoted, and have been answered by that court in numerous cases. In *Federal Const. Co.* v. *Wold,* 30 Cal. App. 360, 158 Pac. 340, it was contended that the California statute placed a liability upon the municipality without a vote of the electorate, in violation of article 11, section 18, of the Constitution of California. The court held, citing many cases, that the constitutional provision referred only to liabilities of the municipality created by contract, and not to liabilities which the law itself imposed upon the municipality. In the case of *Stege* v. *City of Richmond,* 194 Cal. 305, 228 Pac. 461, 466, the same objection was raised, and was answered in the same manner. In addition, it was claimed that the act violated the constitutional inhibitions of article 4, section 31, of the California Constitution, which is similar in effect to our article 9, section 7, *supra.* In meeting this contention, the court said:

"The argument assumes that in the improvement of streets the work is a private matter. On the contrary, such work is for a public purpose. The city might have expended its general funds for that purpose. It was not compelled to do so, and when it elected to proceed under the general street improvement laws it simply adopted the means provided by law whereby it might in accordance therewith exercise a public function without incurring a contractual liability such as is contemplated under section 18 of article 11 of the Constitution and the bond act of 1901. When the city elects to proceed under said act, it assumes the burden of discharging its duties thereunder to the end that the assessment may be enforced."

In the later case of *American Co.* v. *City of Lakeport,* 220 Cal. 548, 26 Pac. (2d) 490, 32 Pac. (2d) 622, 626, the provision of the improvement act of 1915, which

the other cases were based upon, was again attacked and the objections just discussed, together with many others, were raised. The court repeated its ruling on the constitutional questions and, in addition to its declaration that article 11, section 18, did not apply to obligations imposed by law as distinguished from those incurred voluntarily, held that the liability under the act was not direct but contingent only, saying:

"The rule that the inhibitions of the constitutional debt limit do not apply to contingent obligations has long been settled in this state. In *Doland* v. *Clark,* 143 Cal. 176, 76 Pac. 958, 960, where a city by certain contracts agreed to pay for certain services for five years at a monthly rate, it was held that there was no violation of article 11, § 18, the court saying: 'It is evident that they (the contracts) did not create any liability at the time they were executed, except a contingent future liability. . . . The amounts to become due on completion of the contracts by appellant might never become a liability upon the city. A sum payable upon a contingency is not a debt, nor does it become a debt until the contingency happens. . . . There may be ample funds to pay the rental when it accrues, as provided in the contract, if it ever should accrue.' See, also, *McBean* v. *Fresno,* 112 Cal. 159, 44 Pac. 358, 31 L. R. A. 794, 53 Am. St. Rep. 191.

"It is contended, however, that the obligation, contingent at the time the bonds were issued, became fixed and certain upon the happening of the contingency—the occurrence of the delinquencies—and that the unconstitutionality thereof is now established. It is readily apparent that the happening of the contingency does not constitute the 'incurring' of a 'debt' within the meaning of the constitutional provision. The validity of the obligation must be determined as of the time it was incurred. Otherwise, the whole doctrine of contingent liability is repudiated, since upon the happening of the contingency an obligation validly assumed becomes illegal. Cases from other jurisdictions, involving the contingent obligation of a municipality to meet delinquencies in a bond redemption fund,

have uniformly held that no violation of constitutional debt limitations resulted.  [Citing cases.]''

We think this disposes of the constitutional objections made by defendants to section 541, *supra*.

■■  The next objection is that section 3097, Revised Code of 1928, provides that municipalities in making their annual city budget shall not exceed by 10 per cent, the aggregate of actual expenditures for the previous year, exclusive of expenditures for bonds, special assessments, and district levy purposes, and that budgeting the amount required by the court would violate this section of the Code.  There are two answers to defendants' position.  The first is that the 10 per cent. limit expressly excludes amounts required for bonds and special assessments, and the second, that since the appropriation and, therefore, necessarily the budgeting of the amount in question is made mandatory by the legislature, it is in effect an exception to the general rule.  *Maricopa County* v. *Armstrong,* 42 Ariz. 317, 25 Pac. (2d) 1023; *Fullen* v. *Calhoun,* 39 Ariz. 40, 3 Pac. (2d) 786; *Southern Pac. Co.* v. *Yuma County,* 19 Ariz. 211, 168 Pac. 507; *Wabash R. Co.* v. *People ex rel. Patterson,* 187 Ill. 289, 58 N. E. 254; *People ex rel. Means* v. *Hines,* 293 Ill. 419, 127 N. E. 693.  Nor can defendants successfully contend that a similar limitation in the charter of the city of Nogales relieves them from budgeting the amount in question. Section 541, *supra,* is a general, and not a local law, of state-wide application and, therefore, supersedes any charter provision in conflict therewith, even of the so-called self-governing cities.  *City of Phoenix* v. *Drinkwater,* 46 Ariz. 470, 52 Pac. (2d) 1175; *State* v. *Jaastad,* 43 Ariz. 458, 32 Pac. (2d) 799.

■  It is next urged that the effect of the judgment was to compel the city of Nogales to levy a special tax without a vote of the qualified electors of the city, con-

trary to section 4(i), chapter II of the Nogales city charter. It will be noted that the judgment of the court does not expressly require a tax levy, but merely directs the defendants to include in their annual budget a sufficient amount so that there may be appropriated from the general fund of the city a sum sufficient to pay for the property which the city has purchased, or will purchase, for delinquent paving assessments. When the budget is made, the city naturally will be compelled to levy a tax to meet the budgeted amounts, but such tax is not a special but a general tax, payable into the general fund and subject to appropriation from the general fund, for the various purposes set forth in the budget. We think the judgment does not require the imposition of a special tax by the city of Nogales.

The next contention is that under the contracts made between the city and the bond purchasers, it is expressly provided that the former is not liable for payment of any of the bonds set out in the special fund to be collected from special assessments and that, therefore, the bondholders took the bonds with full knowledge that the city in no way guaranteed their payment. The answer to this contention is that all general statutes which affect contracts of a certain class must be read as part of such contracts, whether they are expressly set forth therein or not, and since these bonds not only were issued after the bond act of 1919, but expressly set forth the fact that they were issued in pursuance of said act, its provisions are as much a part of the bonds as though they were formally recited therein. If, therefore, as we have held, section 541, *supra,* does provide that under certain contingencies the general fund of the city shall replenish the special fund from which the bonds are to be paid, there not only is nothing in the contracts which holds that the city may not be liable for the delin-

quency, but they, by reference, expressly provide that under the circumstances set forth herein, the city shall be liable therefor.

The remaining question raised by the defendants is that at the time the application for a writ of *mandamus* was made, there had only been sold to the city lots of the value of $6,797.86, and, therefore, under the express terms of the statute, that was the most for which the city was obliged to budget, whereas, in truth and in fact, the court required it to budget nearly $30,000. The precise question involved is whether, in preparing a budget for the current year, the city should budget not only for the property which has already been sold to it for delinquent assessments, but for such property, as under all the circumstances, it is reasonable to presume will be so sold during the current year. In preparing a budget for prospective expenditures, municipal authorities are necessarily compelled to estimate what those expenditures will be, for there are only a few expenditures, such as interest and principal payable on the direct obligations of the city and debts already incurred, which can then be definitely fixed in amount. In determining the amounts which are necessary for such purposes as fire protection, police, maintenance of streets, waterworks, health sanitation, and general government, the defendants were necessarily compelled to estimate, and did estimate, the probable future expenses on the basis of the requirements of the law and past expenditures, and it is obvious that such is the only manner in which a budget, which includes items, the amount of which cannot be definitely ascertained in advance, can be made. Since it was undoubtedly true, judging from past experience, that the city of Nogales would, under section 541, *supra,* in all probability be compelled to purchase properties for delinquent street assessments during the

current fiscal year, if the officers of that city did their duty, as, of course, it must be presumed they would do, we think the only reasonable rule is that defendants were required to anticipate, using the best sources of information at their command, the amount which probably would be needed for the purchase of such property, in the same manner as they anticipated the probable expenditures for the general purposes above referred to. If the estimate was too great, and a surplus remained, it would be available for the use of the city in the next fiscal year, thus decreasing the amount of the tax levy for that year. If, on the other hand, it were too little, it would be necessary to make an increased estimate and levy during the ensuing year, but in either case, if the defendants used their best judgment in the matter, that was all that could be done and all that was required by the order of the court. It appears from the record in the case that the defendants did finally select a certain sum as the amount necessary to pay for property already purchased and to be purchased during the current year, and did budget it, and this, we think, was a proper and lawful compliance with the order of the court. This concludes a discussion of all of the specific assignments of error made by the defendants.

As we have said, the case has aroused great interest in the various municipalities of the state and the city attorneys of a number of these municipalities have, by leave of court, filed briefs as *amici curiae,* discussing not only the issues raised by defendants, but also raising and discussing others which could have been but were not specifically raised by the assignments of error made by defendants. While strictly this is beyond the province of *amici curiae,* for the reasons set forth in the beginning of this opinion we consider them also.

We think the only one which requires particular discussion is the contention that even admitting section 541, *supra,* directs the city to purchase the delinquent property and to appropriate money from its general fund to pay therefor into the special fund set aside for street assessments, there is no express provision of the statute which requires that the city levy a tax to raise the fund so appropriated, and that since under the general rule the power of the municipality to levy a tax is never implied but must be directly and specifically given by the legislature, in order that such tax may be levied, no authority exists authorizing the defendants to levy a tax for the purpose set forth, and it would be a foolish and futile thing to require them to budget and appropriate a sum which they cannot be compelled nor, indeed, permitted to raise by taxation. The contention is plausible, but we think hardly tenable. It is true that nowhere under section 541, *supra,* nor in any other part of the street improvement act, is there found an explicit direction or authority given to a municipality to levy a specific tax to pay for property which must be purchased by it under section 541, *supra,* or to raise the money which must be appropriated from its general fund by the terms of said section. Every municipality is given the power, either by general statute or by its charter, or both, to levy taxes to raise its general fund, as well as certain specific funds which differ in the various municipalities of the state. So far as the charter of the city of Nogales is concerned, subdivision 33 of section 10, and section 87 thereof expressly provide that the city authorities shall levy a tax sufficient in amount to raise the sums legally budgeted by it for expenditures during the current year. So far as municipalities incorporated under the general law are concerned, it is true that they are expressly limited to the levy of taxes not exceeding a certain amount for certain

specified purposes; the purposes and the limits being as follows: (a) general fund, not exceeding 4 mills on the dollar; (b) construction and repair of streets, sewers, sidewalks, and cross-walks or bridges and culverts, not exceeding 12 mills on the dollar; (c) interest on the total debt of the town, not exceeding 4 mills on the dollar. Section 379, Rev. Code 1928. Since it appears that the city of Nogales, under the law, must budget for the purposes in question, it had ample charter power to levy any taxes necessary to raise the amount so budgeted for. So far, however, as the municipalities organized under the general law are concerned, there is an explicit limit placed by that law upon the amount of taxes which they may levy. We have held, however, in the case of *Town of Flagstaff* v. *Gomez*, 29 Ariz. 481, 242 Pac. 1003, that this limitation refers only to obligations voluntarily incurred by the municipality. It is true that the particular indebtedness for which the town of Flagstaff was required to levy a tax in excess of the statute arose out of a tort, and for that reason was held not to be a voluntary indebtedness, but we see no logical reason why an indebtedness or liability imposed by a superior authority upon a municipality is not an involuntary one and, therefore, not within the limitation of the taxing power aforesaid in the same manner as an indebtedness incurred as the result of a tort and a judgment rendered thereon. Were this not the rule, the consequences might be disastrous in the extreme to any of the municipalities falling within this category. An obligation imposed by specific mandate of the legislature is one which must be met out of funds available for that purpose, before those funds can be used for a mere permissive purpose. *Wiggins* v. *Kerby*, 44 Ariz. 418, 38 Pac. (2d) 315. If, therefore, a municipality may levy only 4 mills for general purposes and the mandatory provision to take care of

delinquent street assessments exhausts the general
fund so raised, there is nothing remaining for the
general and contingent expenses of the city, and its
government must necessarily collapse for lack of abil-
ity to raise funds to meet it.  It will not lightly be pre-
sumed that the legislature meant to impose a burden
upon the cities, which they are not given the power
to meet except at the expense of a total cessation of
general governmental functions.  Statutes must be
construed together for the purpose, if possible, of giv-
ing effect to all of their provisions, and we are of the
opinion that an indebtedness of the kind under dis-
cussion, imposed by the legislature upon a municipal-
ity by a general law, falls within the same exception
as the indebtedness for tort upon which the decision
in *Town of Flagstaff* v. *Gomez, supra,* was based, and
that the limitations in the general law on the taxing
power of the municipality do not apply to such an
indebtedness.

Our attention has been called to the cases of *Ameri-
can Co.* v. *City of Lakeport, supra,* and *Hammond* v.
*City of Burbank,* 6 Cal. (2d) 646, 59 Pac. (2d) 495,
and it is urged that since admittedly our street
improvement acts were taken originally from the
Vrooman Act of California, these decisions are, if not
absolutely binding, extremely persuasive as to the
question raised by *amici curiae* in regard to the power
of the court to compel the replenishing of the special
fund for the payment of bond assessments by general
taxation.  It is true, as we have said several times,
that our original street improvement act of 1912 was
taken to a great extent from the Vrooman Act of Cali-
fornia, and it is also true that the situation which arose
under the Vrooman Act in regard to the difficulty of
negotiating bonds issued under its original provisions
also arose in Arizona, and that both California and

Arizona found it necessary to legislate further in order to make such bonds more readily salable. This legislation, however, as we have previously said, differed widely in its form. The California amendments above referred to, which bear on the question involved herein, are sections 11, 12, and 16 (a) of the 1915 bond act of that state and their purpose, as we have said, is undoubtedly the same as that of section 541, *supra,* to wit, to make the general taxing power of the city available in some manner and to some extent for the payment of delinquent special street assessments. The manner in which they do this, however, is very different from our act of 1919. Under the California law, the property is sold, but apparently the sale is only for the assessment and interest then delinquent. Section 541, *supra,* explicitly provides for the acceleration of the assessments, and that the sale shall be made for the entire assessment, including the one which is delinquent. Under the California law, the tax collector demands a special levy to provide funds to pay for the property, but there is no explicit mandate that the city authorities must levy sufficient tax or make sufficient appropriation from the general fund of the city to meet the payment. The only authority to meet the demand of the tax collector granted the municipality in California is, by its terms, optional, special in its nature, and limited to a tax not exceeding 10 cents on the hundred dollars. Under the Arizona law, there is no express provision for the levy of a special tax to raise the money necessary to pay for the property, but there is an express mandate that an appropriation be made from the general fund of the city of an amount sufficient for that purpose, and that the treasurer must pay the appropriation from the general fund into the special fund. We think the difference in the two statutes is so great that the ruling of the

California courts above cited on the particular provisions of their statute governing the point under discussion is of very little assistance to us in passing upon the meaning and effect of section 541, *supra*. In the cases of *Hammond* v. *City of Burbank, supra,* and *American Co.* v. *City of Lakeport, supra,* the court held in substance (a) that there was no direct instruction to the city to levy any tax for the purpose of making the payment in question, except that contained in section 16 (a), and (b) that it provided for a special tax of a limited amount. Our statute carefully refrains from directing the levy of any special tax, but does explicitly provide that an appropriation sufficient to pay for the property, or at least for the amount of the delinquent assessment, must be made from the general fund, leaving the method of raising the general fund of the city to the general law and/or the specific provisions of the city charter, as the case may be. For these reasons, the California cases are not in point on this particular issue.

For the above reasons, we hold (a) that section 541, *supra,* was within the power of the legislature to enact, and that it is not obnoxious to any constitutional provision; (b) that being a general rule laid down for all the municipalities of the state, it supersedes any special charter provisions in conflict therewith; (c) that by its terms it is the mandatory duty of municipalities which have issued street improvement bonds under the provisions of the facts referred to in this opinion, in case any of the assessments levied for the purpose of the payment of such bonds remain unpaid, to offer the property against which the assessments are levied for sale, and in case no other purchaser appears, to bid in such property for the full amount of the assessments levied thereon; (d) that after such property is so bid in, it is the mandatory duty of the

proper authorities of the municipality to appropriate from its general fund a sufficient amount, either to cover the whole sum for which such property was bid in, or the amount of the assessments and interest then due or to become due thereon, as the officers of the municipality shall elect, and pay such appropriation into the special fund set aside for the payment of such street assessments; (e) that it is the duty of the proper authorities of such municipality, at the making of their annual budget, to budget a sum sufficient to make such payments and to levy a sufficient tax to raise that amount; (f) that in case the proper authorities of the municipality neglect or fail to so budget, appropriate and levy taxes as aforesaid, these acts may be enforced by an action of *mandamus* in the proper court; (g) that in making such budget, it is the duty of the municipal authorities to take into consideration not only the purchase price of property already purchased by the city, but all such property as it may reasonably be expected to be required by law to purchase during the current year.

The judgment of the superior court of Santa Cruz county is affirmed.

McALISTER, C. J., and ROSS, J., concur.