[Civ. No. 30615. First Dist., Div. One. Mar. 17, 1972.]

CITY OF SARATOGA, Petitioner, v.
JAMES R. HUFF, as City Clerk, etc., Respondent;
WEST VALLEY JOINT COMMUNITY COLLEGE DISTRICT,
Real Party in Interest.

**COUNSEL**

Wilson, Jones, Morton & Lynch and Robert G. Auwbrey for Petitioner.

Faber L. Johnston, City Attorney, for Respondent.

No appearance for Real Party in Interest.

**OPINION**

**SIMS, J.**—On petition of the City of Saratoga an alternative writ of mandate was issued directed to the city clerk of that city to show cause why a peremptory writ of mandate should not issue directing him to give notice of the sale of $2,000,000 of special assessment bonds to be issued under the provisions of the Improvement Act of 1911 for an assessment for improvements to be undertaken under the Municipal Improvement Act of 1913 on certain lands of the West Valley Joint Community College District which are situated within the city.[1] The assessment is to be secured by

---

[1]"Mandamus is an appropriate remedy to compel respondent to publish the notice inviting proposals for the bonds in question if the proposed issue meets the requirement of law because the action demanded is ministerial. (*City of Los Angeles* v.

those lands and is to be payable over a 10-year period by the levy of a special tax pursuant to the provisions of section 6468 of the Streets and Highways Code. Respondent clerk contends that the proceedings are void for each and all of the following reasons: (1) that the community college district may not circumvent the debt limitation provision of section 40 of article XIII of the state Constitution by prevailing upon another public entity to create an assessment district, composed solely of property of the college district, for improvements to be constructed solely upon that property and to be owned, controlled and regulated by the district; (2) that the community college district may not so circumvent the maximum tax rate restriction imposed by sections 20751 and 20803 of the Education Code; and (3) that the city cannot construct improvements under section 5101 of the Streets and Highways Code on property in which it has no greater interest than that it obtained by the arrangements with the college district.

It is concluded that under the circumstances of this case the assessment violates the constitutional provision in that it creates a fixed $2,000,000 obligation incurred for the direct benefit of, not the city, but the college district, and payable over a 10-year period out of ad valorem taxes to be levied against all property within the college district; that although under proper circumstances the Legislature may provide for ad valorem taxes at rates in excess of limitations which it has itself fixed, such taxes may not be imposed to pay an obligation which violates the constitutional restriction; and that since the proposed assessment is invalid, it is unnecessary to determine to what extent improvements may be constructed on land of another public entity in which the governing body ordering the

*Offner* (1942) 19 Cal.2d 483 . . .; *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 731 . . .)" (*Metropolitan Water Dist.* v. *Heilbron* (1959) 167 Cal.App.2d 190, 192 [334 P.2d 33]. See also *Sacramento Municipal Util. Dist.* v. *Spink* (1956) 145 Cal.App.2d 568, 572 [303 P.2d 46]; *Fairfield-Suisun Sewer Dist.* v. *Hutcheon* (1956) 139 Cal.App.2d 502, 505 [294 P.2d 102]; *Solvang Municipal Imp. Dist.* v. *Jensen* (1952) 111 Cal.App.2d 237, 238 [244 P.2d 492]; and note *City of Santa Clara* v. *Von Raesfeld* (1970) 3 Cal.3d 239, 243 [90 Cal.Rptr. 8, 474 P.2d 976]; and *Eastern Mun. Water Dist.* v. *Scott* (1969) 1 Cal.App.3d 129, 132 [81 Cal.Rptr. 510].)

California Rules of Court, rule 56 provides in pertinent part, "A petition to a reviewing court for a writ of mandate, certiorari, or prohibition, or for any other writ within its original jurisdiction, must be verified and shall set forth the matters required by law to support the petition, and also the following: (1) If the petition might lawfully have been made to a lower court in the first instance, it shall set forth the circumstances which, in the opinion of the petitioner, render it proper that the writ should issue originally from the reviewing court; . . ." Although no precedent has been referred to in which original proceedings have been entertained by a reviewing court to determine the validity of bonds to be issued under general special assessment laws, in this case it appears that two public entities are involved so that the general authority and manner in which publicly owned property may be assessed (see Sts. & Hy. Code, §§ 5301-5302.6 and §§ 6468-6468.7) is in question, and the matter is of general interest and importance. "Original proceedings have been entertained

improvements has merely an easement for construction. The alternative writ must be discharged, and the petition for a peremptory writ denied.

## I

West Valley Joint Community College District is a community college district which embraces what is alleged to be 230 square miles of land, and includes within its boundaries the City of Saratoga, and all or a portion of seven other cities and some incorporated area, all within the County of Santa Clara. The college district owns a 143-acre parcel of real property within the City of Saratoga on which it has constructed and is operating a community college campus.

On February 18, 1971 the governing board of the college district unanimously adopted a resolution authorizing its chairman and secretary to execute a petition to the City of Saratoga for acquisitions and improvements under the heading "Saratoga Campus Recreational Facilities Assessment District." Although, as pointed out by the city, such a petition is only an informal and nonstatutory request, without express authorization under the provisions of the Education Code or the relevant provisions of the Streets and Highways Code, it may be referred to because it demonstrates that the proceedings were taken by the city at the request of the college district, and because it sets forth succinctly the subsequent legal proceedings taken by the city council, alone, and as a contracting party with the college district.

The petition addressed to the city council reads, "The West Valley Community College District respectfully petitions the City Council of the City of Saratoga as follows: [¶] 1. That you take proceedings under the Municipal Improvement Act of 1913 and issue bonds to represent the unpaid assessments pursuant to Chapter 4.5, commencing with Section 6468, of Part 5 of Division 7 of the Streets and Highways Code, the Improvement Act of 1911, for financing the costs of the following acquisitions and improvements: . . ." There follows references to "A" the improving of four parcels on the campus as offstreet parking lots by grading and the construction thereon of pavement, curbs, gutters, storm drainage

for the purpose of considering validity of municipal bonds under like circumstances. (*Golden Gate Bridge etc. Dist.* v. *Felt,* 214 Cal. 308, 317 . . .; *City of Los Angeles* v. *Dannenbrink,* 234 Cal.App.2d 642, 645 . . .; *Sacramento Mun. Util. Dist.* v. *Spink,* 145 Cal.App.2d 568, 572 . . .; *County Sanitation Dist. No. 1* v. *Humeston,* 103 Cal.App.2d 301 . . .)" (*Eastern Mun. Water Dist.* v. *Scott, supra,* 1 Cal. App.3d 129, 132. See also *Sacramento Municipal Util. Dist.* v. *Spink, supra,* 145 Cal.App.2d 568, 572; *Fairfield-Suisun Sewer Dist.* v. *Hutcheon, supra,* 139 Cal. App.2d 502, 505; and *Solvang Mun. Imp. Dist.* v. *Jensen, supra,* 111 Cal.App.2d 237, 238. Cf. *County of Los Angeles* v. *Nesvig* (1965) 231 Cal.App.2d 603, 608-609 [41 Cal.Rptr. 918].)

facilities, planting and landscaping facilities complete with automatic sprinkler irrigation systems, and lighting facilities, and the construction of, "B" through "M" inclusive, an athletic recreation field, a running track, a baseball field, tennis courts, handball courts, a challenge course, field game areas, a golf area, an archery field, swimming pool bleachers, a chain link fence and a pathway system. Finally "N Auxillary" reads "The acquisition of all lands and easements and the construction of all work auxiliary to any of the above and necessary to complete the same."

The petition continues: "2. That you assess the cost of said acquisitions and improvements, together with the incidental expenses of said proceedings, upon the lands of the West Valley Community College District [in the City of Saratoga] . . . . [¶] 3. That said proceedings provide for the levy of an assessment against the properties of said College District, being the area benefited by said improvements and that bonds to represent said assessment be issued as provided in Section 1 hereof, in order that the amount of said College District assessment may be paid over a period of ten (10) years in the manner provided by law. [¶] 4. That the City of Saratoga make and enter into an agreement with the Joint Junior College District pursuant to Sections 10109 and following of the Streets and Highways Code, so that the ownership and responsibility for maintenance and operation of all of said facilities will vest in said Junior College District."

The petition further designates the engineering firm to be appointed as engineer of the work, provides for approval and inspection by the public works director of the city, specifies that legal services are to be performed by a designated firm of attorneys, which is in fact the same firm that prepared the petition and appears for the city in these proceedings, provides for the compensation of the engineers of the work and the attorneys, and otherwise leaves discretion in the city council.

On March 17, 1971 the city council passed a resolution of preliminary determination to carry out the proposed acquisition and improvements in the manner suggested in the petition under division 4 of the Streets and Highways Code (see § 2800 et seq., The Special Assessment Investigation, Limitation and Majority Protest Act of 1936, particularly § 2821), and a resolution of intention to acquire and construct those improvements (see § 10200). The latter resolution provided, among other things (a) that the public convenience and necessity required, and it was the intention of the council to order, the acquisitions and improvements described therein, (b) that the city proposed to enter into a contract with the district pursuant to section 10109 and following of the Streets and Highways Code, (c) that the boundaries of the assessment district were the composite

and consolidated area of the lands of the college district located in the city, (d) that bonds to represent unpaid assessments would be issued in the manner provided in section 6468 and following of the Improvement Act of 1911, (e) that except as provided for the issuance of bonds, improvements would be done pursuant to the Municipal Improvement Act of 1913, and (f) that the engineer of work for the project was directed to make and file, pursuant to said Municipal Improvement Act of 1913, a report containing, among other things, plans and specifications for the project, an estimate of project costs and expenses, an assessment diagram, a proposed assessment of the project costs and expenses, and descriptions of easements and lands to be acquired.

The reference in the resolution of intention to the contract between the city and the college district is further referred to in the petition as follows: "The subject community recreational and related facilities to be constructed pursuant to the provisions of said Assessment and Assessment Bond Acts are to be constructed upon easements conveyed to the petitioner City by District for such purpose. When constructed the said improvements shall be located within the territorial confines of the said College Campus. In order to protect Campus property against vandalism, to avoid the disruption of classes, to preclude other disruptive and illegal activities, and to provide controls in relation thereto and thereof, controls best formulated by District as a part of its overall regulation of said Campus, said improvements are upon completion to be transferred from petitioner to said District pursuant to a contract entered into by petitioner and said District in accordance with the provisions of S & H 10,109, 10,110, and 10,111 of the said Municipal Improvement Act of 1913."

Thereafter proceedings were taken as required by law, without protest by the college district. At the close of public hearings, and on June 16, 1971, the city council passed a resolution of determination, under division 4 of the Streets and Highways Code, to proceed with proceedings for acquisitions and improvements (see § 2882), and a resolution and order adopting the engineer's report, confirming the assessment, and ordering the work and acquisitions (see § 10312).

The college district did not in 1971, and acknowledgedly would not have during any period in which the assessment would be payable, any ordinary income or revenue monies with which to pay the assessment or any installments thereof.

On August 4, 1971, the assessment being unpaid, the city council duly adopted a resolution calling for bids on the sale of $2,000,000 of special

assessment bonds to be issued pursuant to the provisions of chapter 4.5 (§ 6468 et seq.) of part 5 of division 7 of the Streets and Highways Code (the Improvement Act of 1911) as authorized in the original resolution of intention. The clerk refused to give the notice and these proceedings ensued.

## II

The proceedings have complied with the letter of the enabling laws. The Municipal Improvement Act of 1913 (Sts. & Hy. Code, div. 12, § 10000 et seq.) authorizes the Saratoga City Council to acquire and install any or all of the works and improvements mentioned in the Improvement Act of 1911 (*id.*, div. 7, § 5000 et seq.), and to acquire land, rights of way and easements necessary for such works and improvements (§ 10102). Section 5101 of the latter act, as amended in 1970 (Stats. 1970, chs. 523 and 538, pp. 1020 and 1034), includes within the authorized improvements, "(b) The construction or reconstruction of sidewalks, crosswalks, steps, safety zones, platforms, seats, statuary, fountains, parks and parkways, recreation areas, including all structures, buildings, and other facilities necessary to make parks and parkways and recreation areas useful for the purposes for which intended, culverts, bridges, curbs, gutters, tunnels, subways or viaducts."

The 1913 act provides, "The provisions of the Improvement Act of 1911 relating to assessments on publicly owned property and railroad property, and certificate or bond secured by unpaid assessments on publicly owned property, are incorporated in this division as if fully set out herein." (§ 10206.) The pertinent provisions of the 1911 act are found in sections 5301 through 5303 and 6467 through 6467.3 and 6468 through 6468.7. Section 5301 provides in pertinent part: "If any lot or parcel of land belonging to . . . any county, city, public agent, mandatory of the government, school board, educational, penal or reform institution or institution for the feebleminded or the insane, is in use in the performance of any public function, and is included within the district to be assessed to pay the costs and expenses thereof, the legislative body may, in the resolution of intention, declare that such lots or parcels of land, or any of them, shall be omitted from the assessment thereafter to be made to cover the costs and expenses of the work." Section 5302.5 provides in pertinent part, "If the legislative body, in the resolution of intention, declares that any lot or parcel of land owned and used as provided in Section 5301 shall be included in the assessment, or if no declaration is made respecting any such lot or parcel of land then any assessment upon such lot or parcel of land . . . shall be an enforceable obligation against the owner of such property and shall be paid, . . ." It is contemplated that unpaid assessments may be

financed by payments in installments which may be evidenced in certificates (§ 5302.5 and §§ 6467-6467.3), or, as contemplated and provided in the proceedings under review, by street improvement bonds (§ 5302.6 and §§ 6468-6468.7).

Section 5302.5 also provides: ". . . In the event the legislative body of the entity whose property is assessed decides that said assessment shall be payable in installments, then the officer, officers or board whose duty it is to levy taxes for said obligated owner, including school districts but not limited thereto, shall include in the next tax levy an amount, in addition to moneys for all other purposes, sufficient to pay the annual installment of principal and interest upon said assessment with interest on the unpaid principal of the assessment to date of the payments, and shall include in each succeeding tax levy a like amount or more, in addition to moneys for all other purposes, until the principal of said assessment and all interest on unpaid portions thereof, shall be paid in full. Said tax levy shall be made notwithstanding that said tax levy exceeds the maximum tax rate which may otherwise be imposed by law." The section further provides that such tax levy may be enforced by writ of mandate brought by the owner of the assessment. There is no express provision for the levy of taxes to meet principal and interest payments on bonds issued under the provisions of section 6468. The sole reference is in the form of bond prescribed by that section. Section 6468.6 provides for notice "to the entity whose obligation it is to levy a tax to pay the amount of principal and interest falling due each year," and that "payments shall be made to the city conducting the proceedings by the entity obligated to levy the tax to make the payments due thereon . . . as required by Section 5302.5." The source of the bondholders' rights is apparently the obligation created by the latter section.

■ "There is a broad and well-recognized distinction between a tax levied for general governmental or public purposes and a special assessment levied for improvements made under special laws of local character. [Citations.]" (*Inglewood* v. *County of Los Angeles* (1929) 207 Cal. 697, 702 [280 P. 360]. See also *Cedars of Lebanon Hosp.* v. *County of L.A.* (1950) 35 Cal.2d 729, 746-748 [221 P.2d 31, 15 A.L.R.2d 1045]; *American Co.* v. *City of Lakeport* (1934) 220 Cal. 548, 560 [32 P.2d 622]; *Los Angeles Co. F. C. Dist.* v. *Hamilton* (1917) 177 Cal. 119, 128-129 [169 P. 1028]; *City Street Imp. Co.* v. *Regents etc.* (1908) 153 Cal. 776, 778 [96 P. 801]; *Northwestern etc. Co.* v. *St. Bd. Equal.* (1946) 73 Cal.App.2d 548, 551-553 [166 P.2d 917]; and *Reclamation Dist., etc.* v. *East Bay etc. Dist.* (1928) 91 Cal.App. 143, 147 [266 P. 969].) It has been noted, ". . . the character of a levy as a tax or an assessment depends upon whether it is exacted in compensation for a benefit to the property upon which it is made a charge,

and its classification is not affected by the method adopted for collection." (*Cedars of Lebanon Hosp.* v. *County of L.A., supra,* 35 Cal.2d at p. 748.) Here the $2,000,000 proposed assessment for which the bonds are to be issued and sold is clearly an assessment. The source of payment of the principal and interest due on those bonds—the taxes to be levied on all of the taxable property within the college district under the provisions of section 5302.5—is just as clearly money to be derived from taxes levied for general governmental purposes. (See *American Co.* v. *City of Lakeport, supra,* 220 Cal. 548, 560-561.)

"As to . . . a tax for governmental purposes, property of a municipality is exempt therefrom by express provision of the constitution of this state . . . . (Const., § 1, art. XIII; . . .) These provisions of the constitution . . . however, do not apply to special assessments, and property of a municipality or other property publicly owned may, under certain circumstances, be made liable for special assessments. [Citations.]" (*Inglewood* v. *County of Los Angeles, supra,* 207 Cal. 697, 702-703. See also *Cedars of Lebanon Hosp..* v. *County of L.A., supra,* 35 Cal.2d 729, 746-749; *County of Los Angeles* v. *Hunt* (1926) 198 Cal. 753, 772 [247 P. 897]; and *City Street Imp. Co.* v. *Regents etc., supra,* 153 Cal. 776, 778.)

In *City Street Imp. Co.* v. *Regents etc., supra,* 153 Cal. 776 the following rules were laid down concerning the exemption of school property from special assessments, "The lands, title to which is in the board of regents, are lands held for the public educational purposes of the state, and their holding and their use do not differ in principle from the lands which may be held by boards of school directors or trustees of school districts. The principle is well established that where any of such lands are not directly and necessarily used for a public purpose they may be subjected to the payment of special assessments for benefits." (153 Cal. at p. 779. See also *Conley* v. *Hawley* (1934) 2 Cal.2d 23, 25-27 [38 P.2d 408]; *County of Los Angeles* v. *Hunt, supra,* 198 Cal. 753, 772; *San Diego* v. *Linda Vista I. Dist.* (1895) 108 Cal. 189, 195-196 [41 P. 291]; *Reclamation Dist. etc.* v. *East Bay etc. Dist., supra,* 91 Cal.App. 143, 147-149; *City of Fresno* v. *Fresno Irrigation Dist.* (1925) 72 Cal.App. 503, 506 [237 P. 772].)

"The limitation upon the powers thus to subject lands held for public purposes . . . is that public policy itself will deny and forbid the application of general laws to property so held in trust for public purposes, as public school buildings, city or county municipal buildings, and the necessary land upon which they stand, because of the grave interference with necessary public functions, governmental or educational, which would thus result." (153 Cal. at pp. 779-780. See also *Inglewood* v. *County of Los Angeles, supra,* 207 Cal. 697, 704; *Witter* v. *Mission School District*

(1898) 121 Cal. 350, 352 [53 P. 905]; *Reclamation Dist. etc.* v. *East Bay etc. Dist., supra,* 91 Cal.App. 143, 149-150; *City of Fresno* v. *Fresno Irrigation Dist., supra,* 72 Cal.App. 503, 507-508; and *Raisch* v. *Regents of U.C.* (1918) 37 Cal.App. 697, 699-701 [174 P. 943].)

Nevertheless it has been recognized that property publicly owned and used may be subjected to assessments for public benefits when the Legislature expressly so provides. In *Inglewood* v. *County of Los Angeles, supra,* the court noted, ". . . public property of a municipality, that is, property owned by such a municipality and by it devoted to public use, is liable for special assessments for public improvements only in case there is a positive legislative authority therefor." (207 Cal. at p. 707.) The court drew a distinction between the provisions of the Los Angeles County Flood Control Act (Stats. 1915, ch. 755, p. 1502), the County Sanitation District Act (Stats. 1923, ch. 250, p. 498; cf. Health & Saf. Code, § 4700 et seq.), and the Drainage District Improvement Act of 1919 (Stats. 1919, ch. 354, p. 731) which it was reviewing, and the provisions of the Acquisition and Improvement Act of 1925 (Stats. 1925, ch. 419, p. 849 [repealed Stats. 1933, ch. 346, p. 948]) in which the legislative body conducting proceedings under that act was expressly authorized to levy assessments for local improvements upon the lands of a municipality. (207 Cal. at p. 708.)

In *Los Angeles Co. F. C. Dist.* v. *Hamilton, supra,* the court ruled, "It is thoroughly settled that, in the absence of constitutional restriction, the legislative power to exempt property from taxation extends to every form of the taxing power, including special assessments, as well as general taxes. [Citations.]" (177 Cal. at p. 130.) In *County of Los Angeles* v. *Hunt, supra,* the court upheld the provisions of the Acquisition and Improvement Act of 1925 as against the contention that the provisions of that act which permitted the legislative body in charge of the proceedings to assess or exempt from assessment lands belonging to certain public bodies (see Stats. 1925, ch. 419, § 5, pp. 857-858) were unconstitutional. The court concluded, "We are unable to say in the instant case that the inclusion of the school properties in question in the assessable property of the district was not properly responsive to its location, uses, or to the benefits to be derived by it from the making of the acquisition and improvement in question. It may be noted that under other provisions of the act this method of payment of the burdens laid upon such classes of public property as are to be subjected to this assessment is fully provided for and that the same involves no loss of such properties to the public service or use to which they are devoted. [See *id.,* § 41, p. 81]." (198 Cal. at p. 773.) The provisions last referred to are similar to those found in section 5302.5 in that they require the public entity which owns the assessed property to levy taxes to secure funds with which to meet the assessments.

■ It must be concluded, therefore, that a public entity is generally subject to assessments for public benefits, and that the Legislature may provide that the public entity shall levy taxes to pay the assessments or installments thereof.

## III

Section 40 of article XIII of the California Constitution provides in pertinent part: "No county, city, town, township, board of education, or school district, shall incur any indebtedness or liability in any manner or for any purpose exceeding in any year the income and revenue provided for such year, without the assent of two-thirds of the qualified electors thereof, voting at an election to be held for that purpose, nor unless before or at the time of incurring such indebtedness provision shall be made for the collection of an annual tax sufficient to pay the interest on such indebtedness as it falls due, and also provision to constitute a sinking fund for the payment of the principal thereof, . . ." (These provisions, similar to those originally enacted in 1872, were transferred from article XI, section 13, June 2, 1970.)

The provisions of section 5302.5 apparently satisfy the second requirement of the constitutional mandate. It is strenuously contended by respondent clerk that the entire proceedings are a subterfuge to avoid the requirement of a bond election,[2] and that the application of the special assessment laws to the facts of this case is the incurring of an indebtedness in a manner prohibited by the Constitution.

"The purpose of section 18, article XI, of the Constitution is not to interfere with the city's exercise of its discretion in determining for what objects of public convenience and welfare its power shall be exercised or for which money may be appropriated. It is designed to afford the people who are required to pay the cost of providing such objects of public convenience and welfare an opportunity to express their approval or disapproval of a long-term indebtedness. The constitutional provision does not prohibit the legislative body of the city from spending any or all of its current income for whatever it deems proper or necessary objects of public convenience or welfare. It simply provides that the legislative body may not encumber the general funds of the city beyond the year's income without first obtaining the consent of two thirds of the electorate." (*City of Palm Springs* v. *Ring-*

---

[2]In the return to the alternative writ it is alleged without contradiction, "Within the last 8 years SCHOOL DISTRICT has conducted three different elections (1964, 1965 and 1970) within its boundaries seeking voter approval of bonds to finance capital outlay construction projects at its SARATOGA CAMPUS, and each of said bond elections has failed to pass by the required percentage of affirmative votes."

*wald* (1959) 52 Cal.2d 620, 627 [342 P.2d 898]. See also *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach* (1960) 54 Cal.2d 126, 131 [5 Cal.Rptr. 10, 352 P.2d 170]; and *Lagiss* v. *County of Contra Costa* (1963) 223 Cal.App.2d 77, 85 [35 Cal.Rptr. 450].)[3]

"The constitutional provision involved is based on sound public policy. Arguments of convenience, of policy, or of present necessity, should not be allowed by loose construction to weaken the force or limit the extent of the debt limit provisions." (*Garrett* v. *Swanton* (1932) 216 Cal. 220, 235 [13 P.2d 725] [overruled in part *City of Oxnard* v. *Dale* (1955) 45 Cal.2d 729, 737 (290 P.2d 859)].)

The respondent cannot establish that the proceedings are invalid by merely labeling them a subterfuge to avoid the constitutional restrictions if, in fact, the proceedings, as conducted, fall within the authorization of applicable statutes, and are recognized as exceptions to the constitutional restraint. (See *American Co.* v. *City of Lakeport, supra,* 220 Cal. 548, 558; and *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, 93.) On the other hand, the Legislature cannot itself authorize a public entity to create a general indebtedness in violation of the constitutional provision. (See *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach, supra,* 54 Cal.2d 126, 133.)

In this case the substance of the transaction is that the college district has become subjected to a $2,000,000 obligation to be satisfied by ad valorem taxes over a period of 10 years without the approval of its voters as required by the constitutional provision. Here, unlike the cases referred to above in which the right to assess public property has been upheld, there is no general public improvement carried out by the assessing body for the general benefit of the public property and other property similarly situated with respect to the improvements. The improvements are to be made on property which is presently owned by the college district, and which is to be owned and solely controlled by it after the completion of the improvements (see part V, *infra*). Any benefits to the city and its inhabitants are at best

---

[3]In *Westbrook* v. *Mihaly* (1970) 2 Cal.3d 765 [87 Cal.Rptr. 839, 471 P.2d 847] the court ruled, ". . . we hold that insofar as the constitutional provision engaging our attention (i.e., former art. XI, § 18, now renumbered as art. XIII, § 40) requires the assent of more than a simple majority to authorize the incurring of certain indebtedness by local governmental entities it violates the equal protection clause of the Fourteenth Amendment to the United States Constituion." (2 Cal.3d at p. 799.) On June 14, 1971 the United States Supreme Court granted certiorari, vacated the judgment of the state court, and remanded the case for reconsideration in the light of its decision in *Gordon* v. *Lance* (1971) 403 U.S. 1 [29 L.Ed.2d 273, 91 S.Ct. 1889]. (403 U.S. 915 [29 L.Ed.2d 692, 91 S.Ct. 2224].)

indirect, and the prime beneficiaries are the college district and its students who reside both in and out of the city.[4]

The college district requested the proceedings; the college district arranged to create a limited public—city—interest in the property for the purpose of construction (see part V, *infra*); and the college district failed to file any protest under the provisions of the Special Assessment, Investigation, Limitation and Majority Protest Act of 1931 (see § 2856 or 2930), or under the provisions of the Municipal Improvement Act of 1913 (see §§ 10310 and 10311). It is no answer to say that the college district did not incur an indebtedness by virtue of the foregoing acts and omissions because the assessment and the obligation to pay resulted solely from the acts of the city in confirming the assessment under the provisions of section 10312 in providing for the assessment of public property under sections 10206 and 5301, and in providing for the payment of the assessments pursuant to the provisions of sections 5302.5, 5302.6 and 6468-6468.7. Nor is it material that the four votes which approved the resolution confirming the assessment could have overridden any protest under the 1913 act. (See § 10311; and note *County of Riverside* v. *Whitlock, supra,* 22 Cal.App.3d 863, 870, fn. 8, and 878.) The question is whether the Legislature could empower the city to force the college to incur an indebtedness under the circumstances of this case. Each party acknowledges that there is no controlling precedent.

In *City of Pasadena* v. *McAllaster* (1928) 204 Cal. 267 [267 P. 873] the proceedings involved the provisions of the Acquisition and Improvement Act of 1925 (Stats. 1925, ch. 419, p. 849, repealed Stats. 1933, ch. 346, p. 948). This act provided that assessments could be levied against public property, and that the governing body controlling the land was bound to pay the assessments from any funds available. The city charter imposed a tax limitation only to be exceeded by a two-thirds vote, and, along with the constitutional provisions relied upon in this case, required an election for the incurring of an indebtedness not payable out of the current revenues. The proposed assessment would have resulted in alloting 20.68 percent of

---

[4]It may be assumed that an assessment for public improvements may be levied against property which is in single ownership. (See *Alameda* v. *Cohen* (1901) 133 Cal. 5, 8 [65 P. 127].) That factor is only of significance here because it demonstrates that the benefits for which the assessments are proposed are for the sole benefit of the college district and are not for the benefit of the general public, nor are they charged with a trust for the general public as in the case of facilities transferred to a public utility. (See *County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 876-878 [99 Cal.Rptr. 710], and part V, *infra.*) It also demonstrates that all the property involved belongs to the college district and is in use in the performance of a public function (see § 5301), thereby making the levy of an ad valorem tax for the payment of assessments mandatory (see § 5302.5).

the amount of the total bond issue to municipally owned property situated within one of eight zones found to be benefited by the project. The court stated, "A survey of the authorities on the subject clearly shows that in the application of the prohibitive language of section 18 of article XI of the constitution to the situation here presented at least two conditions must concur: first, that an indebtedness or liability be incurred by the City of Pasadena in excess of the income and revenue provided for the year in which it is incurred, and, secondly, that such indebtedness be incurred voluntarily on the part of the officers of the City having an official duty to perform in the matter. If these two conditions be present the result is not that the indebtedness or liability may not be incurred at all, but that the assent thereto of two-thirds of the qualified electors of the City must be first obtained." (204 Cal. at p. 273.)

The court continued, "The first question, therefore, is this: Does the obligation assumed by the City under the Acquisition and Improvement Act of 1925 and the proceedings in question constitute an indebtedness or liability on the part of the City? The constitutional language is very broad. It is that no 'indebtedness or liability in any manner or for any purpose,' etc., shall be incurred except as in the section permitted." (*Id.*) The court examined the provisions of the law which made the assessments an enforceable obligation against the governing body controlling the land, and which required it to pay the assessment installments from any funds available. The opinion concluded: "It would be difficult to perceive a more direct obligation imposed on the City authorities to pay into the district bond fund the amount of the assessment chargeable against the City. It is conceded that the City's lands, although in form assessed for the improvement, may not legally be sold to satisfy the assessment in the manner provided for the sale of privately owned lands, or at all. The City's proportion of the acquisition cost must be paid into the district bond fund provided for by the act from the general funds of the City or from the proceeds of some general municipal tax levy. In any event the taxpayers of the City as a whole bear the burden of the obligation thus incurred." (*Id.* at p. 274.)

In response to the issue of voluntariness the court stated, "It is argued that the petitioner's obligation to pay the assessment on its property is one imposed by law because section 41 of the act provides that when the municipally owned property is assessed the assessment tax levied thereon is an enforceable obligation against the governing body controlling the land. It is true that the statute so provides, but it does not follow therefrom that the City's liability thereunder is involuntary. The proceeding is instituted by the same governing body charged with the duty of providing the funds for the payment of the bonds. This governing body was under no compulsion to start the proceeding in the first instance. It was entirely optional with the City

to proceed or not to proceed in the commencement thereof. Later it was likewise optional with said governing body to include in or exclude from the assessment the property belonging to the City. Acting voluntarily in both instances the City elected to commence the proceeding and also to include the City property in the assessment. Under these circumstances it would seem idle to argue that the obligation thus assumed is imposed by the law and therefore involuntary." (*Id.* at p. 276.)

Respondent concedes, and petitioner is quick to point out, that the governing body of the city which is conducting the proceedings and is charged with the duty of collecting the funds for the payment of the bonds, is, in this case, not the same as the governing body of the school district which is charged with the obligation of raising those funds from the college district as a whole. (See *Gould* v. *Richmond Sch. Dist.* (1943) 58 Cal.App.2d 497, 502 [136 P.2d 864].) ■ Nevertheless since the city was under no compulsion to start the proceedings in the first instance and it was entirely optional with the city to proceed or not proceed with the commencement of the proceedings, and since there were no private lands or public lands, other than the publicy owned and used lands of the college district to be benefited by the proceedings and the sole source for the payment of the assessments for principal and interest due on the lands is to be the ad valorem taxing power of the district, it is concluded that the constitutional restriction is applicable to the acts of the city in conducting the proceedings and that it cannot under these circumstances cause the school district to incur an indebtedness in excess of that permitted by the Constitution. Insofar as, under these circumstances, sections 5301, 5302.5, 5302.6 and 6468-6468.7 purport to authorize the city to force the public district to incur an indebtedness in excess of the constitutional limit, and to mandate the school district to levy ad valorem taxes to pay the principal and interest on such indebtedness, they must be deemed unconstitutional. No opinion is expressed as to the right of the city to include the property of any public body referred to in section 5301 in proceedings carried on for the joint general benefit of the lands of the public body and the lands of others, when such inclusion will occasion a similar indebtedness.

In support of this conclusion it should be noted that if the obligation to pay the $2,000,000 plus interest, from extra ad valorem taxes to be levied by the college district is in fact involuntary, as contended by petitioner, and so not incurred by the college district, the Legislature must be deemed to have vested authority in the city council, or any other governing body authorized to acquire and install works and improvements, the right to determine what authorized facilities should be constructed on college district property within its territorial confines, and to require the taxpayers of the

college district to pay for them irrespective of fiscal limitations. The very statement of that proposition demonstrates its absurdity. The proceedings could not have been taken without the request, acquiescence, and consent of the governing board of the college district. The proceedings are therefore voluntary as to it, and the resulting debt was incurred by the college district just as the obligation was incurred by the city in *City of Pasadena* v. *McAllaster, supra.* This is not to say that the city, when exercising its interest in improvements which it deems will jointly benefit publicly owned and used property and private property, cannot include and assess the property of the public entity. (See *Cowart* v. *Union Paving Co.* (1932) 216 Cal. 375, 382-383 [14 P.2d 764, 83 A.L.R. 1185]; and *County of Los Angeles* v. *Hunt, supra,* 198 Cal. 753, 771-773, and other cases noted in part II above.)[5] The power of the Legislature to permit the entity desiring general public improvements to proceed without being frustrated by the failure, refusal or inability of a governing body controlling public land which is to be benefited by the improvement, to contribute to the cost of the improvements,

---

[5] As set forth in part II, above, it is clear that publicly owned lands not directly and necessarily used for public purposes may be assessed for public improvements. Although *County of Los Angeles* v. *Hunt, supra,* indicates that properties used for school purposes may be assessed for special benefits (198 Cal. 753, 771-773), there is no clear cut decision upholding the mandatory levy of ad valorem taxes to pay assessments on publicly owned land devoted to public use. In *Southlands Co.* v. *City of San Diego* (1931) 211 Cal. 646 [297 P. 521] the court ruled as follows: "Appellants next object to the improvement on the ground that the City of San Diego owns a large acreage within the assessment district, consisting of pueblo lands not used in the performance of a public function, and which lands are subjected to the assessment. It is contended that such liability creates an indebtedness of the city in violation of the debt limitations found in the Constitution and city charter. The conclusive answer to this contention is found in the fact that the lands of the city so subject to assessment are admittedly not lands used in the performance of a public function. The lands themselves, therefore, are the primary debtor and not the city. In the case of *Pasadena* v. *McAllaster,* 204 Cal. 267 . . ., chiefly relied on by the appellants, the lands involved were public lands used in the performance of a public function, and, therefore, the lands themselves could not be sold to satisfy the assessment, the city, under the terms of the act, being personally liable for the assessment. Here, however, the lands are not being used in the performance of a public function, and they may, therefore, be sold to satisfy the assessment. Under such circumstances, the liability is primarily that of the lands and not of the city, and obviously, the debt limitations of the state Constitution and the city charter are not applicable." (211 Cal. at pp. 668-669. Cf. *Raisch* v. *Regents of U. C.* (1918) 37 Cal.App. 697, 700-801 [174 P. 943].) It is unnecessary to resolve that question here, and it is assumed that a nondiscriminatory assessment which embraces the publicly used and other property may be properly enforced under the provisions questioned in this case.

A distinction should also be noted between an original assessment of publicly owned and used property, as in this case, and the liability of a public entity for property acquired for public use which is already subject to assessment proceedings. (See *Bing* v. *City of Duarte* (1967) 65 Cal.2d 627, 634 [55 Cal.Rptr. 920, 422 P.2d 608] [construing § 5248]; and cf. *Inglewood* v. *County of Los Angeles, supra,* 207 Cal. 697, 706-707.)

should be distinguished from what petitioner contends the Legislature authorized here.

Petitioner relies upon *Sacramento Municipal Util. Dist.* v. *Spink* (1956) 145 Cal.App.2d 568 [303 P.2d 46] as demonstrating that although a public body voluntarily subjects itself to taxation, the obligation thereby incurred does not fall within the constitutional limitation. Section 1 of article XIII of the California Constitution which exempts property used exclusively for public schools and other public property from ad valorem taxation, also provides an exception from the exemption for public lands and the improvements thereon of a county, city and county or municipal corporation located outside the boundaries of the public entity owning such lands, to the extent such lands and improvements were subject to taxation at the time they were acquired by the public entity. (See *San Francisco* v. *County of Alameda* (1936) 5 Cal.2d 243, 245-246 [54 P.2d 462].) Spink, the utility district secretary, refused to sign revenue bonds for the purpose of developing hydroelectric generating facilities in El Dorado County and transmission lines to carry the electricity to the district's distribution systems in Sacramento and Placer Counties. It was contended, inter alia, that El Dorado County might impose taxes which would exceed the annual income of the district and that thereby the debt limitation contained in section 12841 of the Public Utilities Code, which is similar to the constitutional provision under review, would be exceeded.

The court stated, "There can be no doubt that the district has the power to pay any taxes levied upon property acquired by it in El Dorado County. (Pub. Util. Code, §§ 11884, 11891, 12721.) [¶] Furthermore, by acquiring property in El Dorado County petitioner district will not thereby incur an indebtedness in any sense of the word. For that matter, even future taxes that might be levied against property in El Dorado County would not constitute an indebtedness within the meaning of section 12841, as they would not be a voluntary obligation, but an obligation imposed by law. In construing the similar debt limitation of article XI, section 18, of the California Constitution, it has been held many times that an obligation imposed by law does not come within the limitations of that section. See *Long Beach* v. *Lisenby*, 180 Cal. 52 . . .; *County of Los Angeles* v. *Byram*, 36 Cal.2d 694 . . .; and 18 California Jurisprudence, Municipal Corporations, section 178, page 822. The district has the power to increase its revenues to meet any increase in costs by an increase in its rates (Pub. Util. Code, § 12809) or by a levy of taxes (Pub. Util. Code, § 12892)." (145 Cal. App.2d at pp. 579-580.)

Since the utility district did not incur any indebtedness the analogy fails.

In *City of Pasadena* v. *McAllaster, supra,* the court pointed out, "It is not the liability of the city generally *on the bonds* to be issued that presents the crucial questions. The liability of the City generally to feed the fund from which the bonds are to be paid is the vital point. That liability is definite, certain, and irrevocable during the full period of outstanding bonds and for the full proportion of the City's share. In principle this situation cannot be distinguished from that wherein a City is proposing to acquire the land by purchase and is binding itself to provide the funds, either from the general funds of the City or from a levy of a tax on the property in the municipality as a whole to pay the cost of the acquisition. In the event that the bonds be sold to provide the money to satisfy the judgment, and the title to the property condemned be transferred to the City the transaction will be closed so far as the acquisition proceeding is concerned." (204 Cal. at p. 275.) Here if the bonds are authorized the obligation to pay $2,000,000 and interest will have been incurred. It may be further noted that here no provisions have been made for revenues to flow from the proposed improvements and that the college district does not have unlimited power to tax to meet recurring obligations as does the utility district. (Cf. Pub. Util. Code, §§ 12891-12904, with Ed. Code, §§ 20751 and 20803.) There remains for consideration the repeated contention of petitioner, noted above in *Spink,* that an obligation imposed by law is not within the constitutional provisions, and its assertion that the obligation should not be considered because it is contingent.

Following the passage last quoted from *City of Pasadena* v. *McAllaster, supra,* that court distinguished cases in which "the right to public funds accrued only after the performance of some future service on the part of those whose claims thereto might arise or upon the happening of some contingency which might not arise. . . ." (204 Cal. at p. 276.) (See *Doland* v. *Clark* (1904) 143 Cal. 176, 179-183 [76 P. 958] [five year lease of fire-alarm and police telegraph systems, with option to purchase]; *Smilie* v. *Fresno County* (1896) 112 Cal. 311, 313 [44 P. 556] [construction contract, payable in installments as work completed where revenue sufficient]; and *McBean* v. *City of Fresno* (1896) 112 Cal. 159, 163-169 [44 P. 358] [five year contract for disposal of sewage]; all cited in *McAllaster*; and note *County of Los Angeles* v. *Byram* (1951) 36 Cal.2d 694, 700 [227 P.2d 4]; *City of Los Angeles* v. *Offner* (1942) 19 Cal.2d 483, 485-487 [122 P.2d 14, 145 A.L.R. 1358]; *American Co.* v. *City of Lakeport, supra,* 220 Cal. 548, 557-558; *County of Los Angeles* v. *Nesvig* (1965) 231 Cal. App.2d 603, 609-612 [41 Cal.Rptr. 918]; *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, 85-91; *City of La Habra* v. *Pellerin* (1963) 216 Cal.App.2d 99, 101-102 [30 Cal.Rptr. 752]; *City of Montclair* v. *Donaldson* (1962) 205 Cal.App.2d 201, 205-206 [22 Cal.Rptr.

842]; and *City of Pasadena* v. *Chamberlain* (1934) 1 Cal.App.2d 125, 135-136 [36 P.2d 387]. Cf. *Garrett* v. *Swanton* (1932) 216 Cal. 220, 229-234 [13 P.2d 725] [distinguished in *City of Los Angeles* v. *Offner, supra,* 19 Cal.2d at p. 486, and overruled in part *City of Oxnard* v. *Dale, supra,* 45 Cal.2d at p. 737].) With respect to such situations the *McAllaster* court pointed out, "In the present case the right to the full purchase price will accrue at once upon the finality of the judgment in condemnation, which finality necessarily would occur prior to the assessment and also prior to the sale of the bonds." (204 Cal. at p. 276.) So here the entire liability accrued upon the passage of the resolution of approval adopted June 16, 1971, and it would be finalized by the issuance and sale of the bonds. The fact that the college district's voluntarily incurred liability was contingent until the city council finally acted, does not render it a contingent installment obligation after such action was taken.

In attempting to show that the obligation imposed in these proceedings is an obligation imposed by law and so without the scope of the constitutional restraint, the petitioner relies upon *County of Los Angeles* v. *Byram, supra.* There the court reviewed existing precedents as follows: "An obligation imposed by law upon a city or county is not an indebtedness or liability within the meaning of the debt limitation provision. (*McCracken* v. *City of San Francisco,* 16 Cal. 591, obligation to refund purchase price of property of city illegally sold by it; *City of Long Beach* v. *Lisenby,* 180 Cal. 52 . . .; *Metropolitan Life Ins. Co.* v. *Deasy,* 41 Cal.App. 667 . . ., and see *McBean* v. *City of Fresno,* 112 Cal. 159, 166 . . ., tort liability; *Cashin* v. *Dunn,* 58 Cal. 581, *Welch* v. *Strother,* 74 Cal. 413 . . ., *Lewis* v. *Widber,* 99 Cal. 412 . . ., *Martin* v. *Fisher,* 108 Cal.App. 34 . . ., *Lotts* v. *Board of Park Commrs.,* 13 Cal.App.2d 625 . . ., and see *Harrison* v. *Horton,* 5 Cal.App. 415 . . ., liability for salary of city or county officer or employee fixed by Legislature; *Oscar Heyman & Brother* v. *Bath,* 58 Cal.App. 499 . . ., refund of illegal tax; *American Co.* v. *City of Lakeport,* 220 Cal. 548 . . ., cf. *Wulff-Hansen & Co.* v. *Silvers,* 21 Cal.2d 253 . . ., obligation of a city to purchase and pay into bond redemption fund land sold for delinquent special assessments where there are no other purchasers; *Mills* v. *Houck,* 124 Cal.App. 1 . . ., judgment against city for costs where it dismissed an eminent domain proceeding and such costs were allowed by section 1255a of the Code of Civil Procedure; see *Arthur* v. *City of Petaluma,* 175 Cal. 216 . . .; *City of Pasadena* v. *McAllaster,* 204 Cal. 267 . . . .)" (36 Cal.2d at p. 698. In addition to the cases cited, see *Lagiss* v. *County of Contra Costa, supra,* 223 Cal.App.2d 77, 85-91; *City of La Habra* v. *Pellerin, supra,* 216 Cal.App.2d 99, 102 [obligation of a city to provide police and fire protection]; and *People* ex rel. *City of Downey* v. *Downey County Water Dist.* (1962) 202 Cal.App.2d 786, 805 [21 Cal.

Rptr. 370] [obligation to pay principal and interest of outstanding county water district bonds when district merged into municipality by operation of law]; but cf. *Chester* v. *Carmichael* (1921) 187 Cal. 287, 291-294 [201 P. 925] [$50,000 obligation undertaken for grant of park land], with *Estate of Hart* (1957) 151 Cal.App.2d 271, 278-282 [311 P.2d 605] [acceptance of grant on condition, without obligation]; and note *Arthur* v. *City of Petaluma* (1917) 175 Cal. 216, 218-225 [165 P. 696] [judgment for claim uncollectible when incurred cannot be paid out of future income]; and *People* v. *Hanford High School Dist.* (1906) 148 Cal. 705, 710 [84 P. 193] [annexed school district must vote before it becomes liable for bonded indebtedness of annexing district].)

It is not seriously contended that the college district is liable to levy taxes to pay the installments on the assessments, and therefore the bonds, because it has a duty to furnish educational facilities. It is clear that its obligation to furnish such facilities, as distinguished from a county's obligation to furnish quarters for the courts, is hedged in by statutory fiscal restraints which are not applicable to a county. Insofar as *City of La Habra* v. *Pellerin, supra,* suggests that a municipality may exceed its statutory tax limit, as distinguished from paying installments of rent within its proper budget, so as to provide police and fire protection, it is of questionable standing.

Petitioner does insist that the assessments of $2,000,000 in this case, despite the analysis set forth above, constitutes an obligation imposed by law. It is obvious that most of the obligations referred to in *County of Los Angeles* v. *Byram, supra,* and related cases, have no relationship to the obligation involved in this case. (See *City of Pasadena* v. *McAllaster, supra,* 204 Cal. at pp. 276-277.) The only close analogy is the statutory obligation of a city to purchase and pay into a bond redemption fund the then delinquent special assessments on land sold for such delinquency when there are no other purchasers. (See *Wulff-Hansen & Co.* v. *Silvers* (1942) 21 Cal.2d 253, 265-267 [131 P.2d 373]; *Anglo Cal. Nat. Bank* v. *Leland* (1937) 9 Cal.2d 347, 351 [70 P.2d 937]; *City of Los Angeles* v. *Aldrich* (1937) 8 Cal.2d 541, 547-548 [66 P.2d 647] [provision for further accruing assessments upheld]; *Kerr G. Mfg. Corp.* v. *San Buenaventura* (1936) 7 Cal.2d 701, 706 [62 P.2d 583]; *Hammond* v. *City of Burbank* (1936) 6 Cal.2d 646, 652-657 [59 P.2d 495]; *American Co.* v. *City of Lakeport, supra,* 220 Cal. 548, 557-560; *Saunders* v. *Carr* (1968) 268 Cal.App.2d 10, 17 [74 Cal.Rptr. 147]; *Union Safe Deposit Bk.* v. *City of Clovis* (1937) 23 Cal.App.2d 358, 362 [73 P.2d 242]; and *Federal Construction Co.* v. *Wold* (1916) 30 Cal.App. 360, 361 [158 P. 340].) In *Union Safe Deposit Bk.* v. *City of Clovis* the court reviewed numerous

cases dealing with the subject and concluded, "It is now settled that section twelve of the Improvement Bond Act [of 1915—Sts. & Hy. Code, §§ 8800-8809] provides a plan for the sale of property for delinquent assessments; that the city shall pay the amount bid for the property on the initial sale; that if the property be not redeemed or resold and if it has surplus unappropriated funds in its treasury the city should pay future assessments as they become due until the property is redeemed or resold. This section gives to the bondholder no power to compel the levy of a tax to pay delinquencies." (23 Cal.App.2d at p. 362.)

Such provisions (Sts. & Hy. Code, §§ 8800-8809) are distinguishable from the obligation and levy which is the subject of sections 5301, 5302.5, 5302.6 and 6468-6468.7. In *City of Pasadena* v. *McAllaster, supra,* the court noted the approval of the former provisions in *Federal Construction Co.* v. *Wold, supra,* and stated, "In the Federal Construction Company case it was held that the obligation of the municipality to purchase all property offered at delinquent sales for the nonpayment of street assessments, in the absence of other purchasers, pursuant to the Improvement Act of 1911 [Stats. 1911, p. 730], and the Improvement Bond Act of 1915 [Stats. 1915, p. 1441], was an obligation imposed on the city by law and was not a liability prohibited by the constitutional provision. In such a case the payment out of the public treasury is for the purpose of a loan or advancement to facilitate and make effectual the proceedings under the act and which the city may later recover." (204 Cal. at p. 277.) The succeeding cases have consistently recognized this difference. (See *Anglo Cal. Nat. Bank* v. *Leland, supra,* 9 Cal.2d at p. 351; *Hammond* v. *City of Burbank, supra,* 6 Cal.2d at p. 656; *American Co.* v. *City of Lakeport, supra,* 220 Cal. at pp. 559-560; and *Union Safe Deposit Bk.* v. *City of Clovis, supra,* 23 Cal. App.2d at p. 363.) In *City of Los Angeles* v. *Aldrich, supra,* in discussing *McAllaster* the court noted, "In that case municipally-owned property was included in the assessment district, and the advances required to be made left the coffers of the city irrevocably." (8 Cal.2d at p. 548.) So here the levies if made and collected from the taxpayers of the college district would leave the district's coffers irrevocably in satisfaction of an unconstitutionally incurred obligation. Although "imposed by law" such imposition is constitutionally prohibited for the reasons set forth above.

Further exception to constitutional restraint is found in the special fund doctrine. (See *City of Santa Clara* v. *Van Raesfeld, supra,* 3 Cal.3d 239, 247-248; *City of Redondo Beach* v. *Taxpayers, Property Owners, etc., City of Redondo Beach, supra,* 54 Cal.2d 126, 131-133; *City of Palm Springs* v. *Ringwald, supra,* 52 Cal.2d 620, 624-626; *City of Oxnard* v. *Dale, supra,* 45 Cal.2d 729, 733; *California Toll Bridge Authority* v. *Kelly* (1933) 218

Cal. 7, 13-14 [21 P.2d 425]; and *City of Montclair* v. *Donaldson, supra,* 205 Cal.App.2d 201, 204-205.) The funds to be raised in this case are from special ad valorem taxes levied pursuant to section 5302.5. No revenues are contemplated from the improvements. The inapplicability of the special fund doctrine is demonstrated by the following passage from the *City of Redondo Beach* case, where the court stated, ". . . the special fund doctrine is a judicial interpretation of article XI, section 18 of the Constitution. As such, it may not be changed by legislative fiat. In the *Ringwald* case we held, in effect, that the general funds within the purview of the aforesaid constitutional provision included sales tax revenues. If the Legislature could change the defintion of general funds under section 18 of article XI at its pleasure it could easily exclude ad valorem taxes from a city's general funds thereby completely negating the effect of the debt limitation provision." (54 Cal.2d at p. 133.)

Reference to precedents from other jurisdictions does not strengthen petitioner's case. It is generally held that assessments for a public improvement may be made against property owned by the public, and used for school or other public purposes, for benefits received from the acquisition and construction of the improvement. (See *Rainwater* v. *Haynes* (1968) 244 Ark. 1191, 1192 [428 S.W.2d 254, 256-257]; *City of Idabel* v. *School Dist. No. Five (5), McCurtain Co.* (Okla. 1967) 434 P.2d 285, 288; *Gutierrez* v. *Middle Rio Grande Conservancy Dist.* (1929) 34 N.M. 346, 360-361 [282 P. 1, 7, 70 A.L.R. 1261]; *State* ex rel. *City of Renton* v. *Commercial Waterway Dist. No. 2* (1929) 152 Wash. 523, 529 [278 P. 423, 426]; *People* ex rel. *Setters* v. *Lee* (1923) 72 Colo. 598, 611 [213 P. 583, 589-590]; *In re Howard Avenue, North* (1906) 44 Wash. 62, 65 [86 P. 1117, 1118-1119]; and Annot., Exemption of Public School Property from Assessments for Local Improvements (1967) 15 A.L.R.3d 847; Annot., Special Assessments, Public Property (1934) 90 A.L.R. 1137.)

In *Howard Avenue North, supra,* the court pointed out, "An exemption of any portion of the benefited property located within the assessment district would necessarily cause an increased burden to be imposed upon other benefited property located therein . . . ." (44 Wash. at p. 65 [86 P. at p. 1119].) No such justification is present in this case.

Since property in public use cannot be sold for delinquent assessments, collection may only be enforced by judgment against the public body controlling the property, or by an order for it to levy taxes to meet the assessment if necessary. (See *State* ex rel. *City of Renton* v. *Commercial Waterway Dist. No. 2, supra,* 152 Wash. 523, 530-532 [278 P. 423, 426-427]; Annot., Assessments Against Public Property (1944) 150 A.L.R. 1394 and

(1935) 95 A.L.R. 689.) If the amount of the assessment against the property of the governing board which itself is conducting the proceedings exceeds the authorized indebtedness of that entity the assessment may be invalid. (See *People* v. *Chicago & A. R. Co.* (1912) 253 Ill. 191, 193-196 [97 N.E. 310, 311-312]; and Annot., Municipal Debt Limit, Local Improvements (1924) 33 A.L.R. 1415, 1422.) A similar result has been reached when the assessed public entity, although a separate body, has previously exhausted its borrowing capacity. (See *State* ex rel. *Keck* v. *Sunnyside* (1935) 181 Wash. 511, 513-516 [43 P.2d 621, 98 A.L.R. 741]; and Annot., Municipal Debt Limit, Special Assessments (1935) 98 A.L.R. 749.)

In *McKinley* v. *Alamogordo Muncipal School Dist. Auth.* (1969) 81 N.M. 196 [465 P.2d 79] the court reviewed a plan whereby a school district "authority," a nonprofit-corporation with membership identical to the governing board of the school district, was to purchase land of the school district for a nominal sum, build a school building and lease it to the school district on a year-to-year basis, with an option to purchase. The school district agreed to budget and appropriate sufficient funds to pay the basic annual rental for each term the lease was in effect, and that there would be a lien on all of the district's income from all sources, except ad valorem taxes, to cover the rental payments to be made. The "authority" proposed to issue bonds secured by a mortgage of the property and the rents to be received. In the course of holding that the arrangement violated a constitutional provision which placed a limitation on the amount of indebtedness and which required an election for a school district to borrow money, the court concluded "that the authority is clearly nothing more nor less than the School District acting through a public entity . . . other than its regularly designated Board. It seems self-evident to us that the procedure authorized by the School Leasing Law is simply an effort by indirection to avoid the provisions of Art. IX, § 11, N.M.Const., when it could not be done directly. This is not permissible. If the plan were approved, we foresee the limitation of Art. IX, § 11, supra, would be effectively nullified because the Authority would be subject to no limitations, or, if it exhausted its borrowing power, a second, a third, and additional authorities ad infinitum could be created. The crucial question, however, is simply whether the issuance of the bonds becomes an 'indebtedness' of the school district. Geographically, the area governed by the School District and that included under the School District Authority are identical. The building of the structure by the Authority to be leased to the District unquestionably amounts to the performance of an act by the Authority that comes directly within the powers and duties of the Board on behalf of the District . . . . No money or property is available as security for the payment of the bond indebted-

ness beyond income to the District and committed to the Authority as rent, together with the property itself. How can it be asserted that the indebtedness is not that of the District?" (81 N.M. at pp. 199-200 [465 P.2d at pp. 82-83].) So here the assessment district although created and governed by the city council is for all practical purposes the college district itself, and its obligation is the obligation of the district.

In *People* v. *Chicago & A. R. Co., supra,* the court stated, "The prohibition of the constitution is against voluntarily incurring an indebtedness in any manner or for any purpose, and it makes no difference under what guise the attempt is made or what form the proceeding takes. The object is to protect the property of citizens from being burdened beyond five per cent of its value, as ascertained by the assessment for state and county taxes, with any indebtedness extending into the future, and any plan or scheme which has the effect of creating such a burden is prohibited by the constitution." (253 Ill. at pp. 193-194 [97 N.E. at p. 311].)

Although generally a judgment will constitute an obligation imposed by law so as to be without the scope of fiscal restrictions which limit the amount of indebtedness or require an election, the courts will look behind a confessed judgment. In *Green* v. *Hutsonville Tp. High School Dist.* (1934) 356 Ill. 216 [190 N.E. 267] an attack was made on bonds issued to pay judgments which the school district had permitted to be entered against it on claims which were barred because in excess of its legal debt limit. The court quoted from the foregoing case, and concluded: "It appears from the record in this case that the school district deliberately and intentionally attempted to create an indebtedness nearly twice that permitted by our constitution. A mere look at the facts makes it obvious that a scheme or device has here been resorted to for the purpose of burdening the tax-payers of this district with a much more expensive school house than the valuation of the district would warrant or the constitution permit. It necessarily follows that this excess of indebtedness was void ab initio, and the only question for determination is whether or not the judgments taken by consent were sufficient to breathe life into a totally dead transaction. It is strenuously urged that such is the fact, and some dozens of cases are cited to the general effect that, if a court has jurisdiction of the parties and subject matter, its judgment cannot be collaterally attacked. It is also urged that the board of education in confessing these judgments was acting on behalf of the tax-payers, and that the tax-payers were in privity with the board of education and are bound by its acts. It would be a strange rule to hold that the board was acting for the tax-payers and in their interest, when it is apparent to anyone that they were acting against the tax-payers, against their interests, and in direct violation of the Constitution. The

authorities do not support any such unreasonable doctrine." (356 Ill. at pp. 220-221 [190 N.E. at p. 269].) The court ruled that under the circumstances there could be no estoppel by the consent judgments, and it restrained the collection of taxes to pay the bonds issued to pay the judgments. (See also *Arthur* v. *City of Petaluma, supra,* 175 Cal. 216, 224; *Leviton* v. *Board of Education of City of Chicago* (1940) 374 Ill. 594, 601-602 [30 N.E.2d 497, 501-502]; and *Connor* v. *Morse* (1939) 303 Mass. 42, 46-47 [20 N.E.2d 424, 426-427].) So here the device of using the assessment proceedings should not be countenanced so as to enable the governing board of the school district to avoid the constitutional restraint.

It is concluded that the provisions of sections 10206, 5301, 5302.5, 5302.6 and 6468-6468.7 of the Streets and Highways Code cannot be constitutionally applied to sustain the proposed assessment and bonds under the circumstances of this case.

## IV

In his return respondent alleges, "Said SCHOOL DISTRICT, at all times mentioned in petitioner's petition, had and presently has already set its tax rate at the maximum level permitted by law, unless compliance is had with Education Code § 20803 or unless coming within some other statutory exemption from such maximum limits." He alleges that the proposed tax levy (see Sts. & Hy. Code, § 5302.5) violates the provisions of the Education Code. Section 20751 of that code fixes the maximum ad valorem tax rates which may be levied by school districts including junior or community (see Ed. Code, § 52) college districts. Sections 20803-20805 provide for the increase of the maximum tax rate fixed by the Legislature by a majority vote of the qualified electors of the district. The foregoing legislation is authorized by article IX, section 6 of the state Constitution which provides in pertinent part, "The Legislature shall provide for the levying annually by the governing body of each county, and city and county, of such school district taxes, at rates not in excess of the maximum rates of school district tax fixed or authorized by the Legislature, as will produce in each fiscal year such revenue for each school district as the governing board therof shall determine is required in such fiscal year for the support of all schools and functions of said district authorized or required by law."

"The public schools of this state are a matter of statewide rather than local or municipal concern; their establishment, regulation and operation are covered by the Constitution and the state Legislature is given comprehensive powers in relation thereto." (*Hall* v. *City of Taft* (1956) 47 Cal.2d

177, 179 [302 P.2d 574]. See also *MacMillan Co. v. Clarke* (1920) 184 Cal. 491, 503-506 [194 P. 1030, 17 A.L.R. 288].) In the exercise of its power the Legislature has provided that specific taxes may be imposed, in excess of the maximum otherwise fixed, for specific purposes authorized by the Legislature. (See, e.g., Ed. Code, §§ 20752 and 20755,[6] and art. 3 of ch. 3 of div. 16 of pt. 3, §§ 20800-20816, *passim;* and cf. *Saunders v. Carr* (1968) 268 Cal.App.2d 10, 18-21 [74 Cal.Rptr. 147].)

■ It would therefore appear that the Legislature may properly provide, as it has done in section 5302.5 of the Streets and Highways Code, that the tax levy to meet installments of principal and interest on a constitutionally imposed assessment "shall be made notwithstanding that said tax levy exceeds the maximum tax rate which may otherwise be imposed by law." As noted above (part III), this power of the Legislature does not extend to the levy of a tax to meet an obligation—assessment—which is unconstitutionally incurred.

## V

The petition alleges, "The subject community recreational and related facilities to be constructed pursuant to the provisions of said Assessment and Assessment Bond Acts are to be constructed upon easement conveyed to the petitioner City by District for such purpose. When constructed the said improvements shall be located within the territorial confines of the said College Campus. In order to protect Campus property against vandalism, to avoid the disruption of classes, to preclude other disruptive and illegal activities, and to provide controls in relation thereto and thereof, controls best formulated by District as part of its overall regulation of said Campus, said improvements are upon completion to be transferred from

---

[6]Education Code section 20755 provides: "Notwithstanding the provisions of this article or any other provisions of law to the contrary, the governing board of a district maintaining a community college may each year have levied and collected school district taxes, for that year, without limitation as to rate, for purposes of providing funds for the annual district share of any project approved pursuant to Chapter 19 (commencing with Section 20050) of Division 14, including any funds required to obtain federal funds for such project or any part of the project."

Chapter 19 of division 14 (§§ 20050-20084, The Community College Construction Act of 1967, as amended by Stats. 1970, ch. 102, §§ 270-291, and ch. 1144, § 1) contains a comprehensive program for acquisition, improvement, and construction of instructional facilities with federal, state and district funds. It is contemplated that the State Department of Education shall determine the amount of federal funds available for a project planned by the district and the respective shares of the remainder of the estimated cost to be borne by the state and the district. (See § 20081, subds. (c) and (d).) No opinion is expressed as to the obligations which may be assumed by a community college district under this enabling legislation. The Legislature may provide for taxes for a building fund. (See *Los Angeles City High School Dist. v. Payne* (1932) 216 Cal. 588, 592-593 [15 P.2d 501, 16 P.2d 139].)

petitioner to said District pursuant to a contract entered into by petitioner and said District in accordance with the provisions of S & H 10,109, 10,110, and 10,111 of the said Municipal Improvement Act of 1913."

Section 10109 provides: "Whenever the improvement or acquisition includes the acquiring or the installation of works, appliances or improvements authorized by this division, and the works, appliances, or improvements are, or may be, under the ownership, management, or control of any public agency other than the city making the acquisition or ordering the work done, or of a regulated public utility, the works, appliances, or improvements may be acquired or installed under the proceedings specified in this division."

Under the provisions in question it has been held that improvements which are authorized under the Municipal Improvement Act of 1913 may be constructed through special assessment proceedings under a contract with a utility company and turned over to the company upon completion. (*County of Riverside* v. *Whitlock* (1972) 22 Cal.App.3d 863, 876-878 [99 Cal.Rptr. 710].) The court noted, "The gas company is a regulated public utility obligated by law to manage and operate its system to provide service to the inhabitants of the lands within the [assessment] district." (22 Cal.App.3d at p. 877.) Here it is obvious that no one within the assessed district—the college lands—is to receive the benefits of the improvements. It is the students attending the college who will receive the benefits, and the taxpayers of the college district who are being asked to bear the obligation to pay for the improvements. The contract has not been made part of this record. Nevertheless, for the reasons set forth above, the city cannot constitutionally impose this obligation on the district's taxpayers by assessment or contract.

The improvements contemplated in the proceedings under review are not those directly contemplated by the Municipal Improvement Act of 1913. (See §§ 10002, 10010, 10100, 10100.5 and 10101.) The 1913 law is applicable because it by reference embraces improvements authorized by the Improvement Act of 1911 (see § 10102). Subdivision (b) of section 5101, as amended in 1970, which is set forth above, provides for the work in question. Section 5101 defines the property in, over, or on which the contemplated improvement may be constructed. It includes ". . . any one or more of the streets, places, public ways, or property, easements, or rights-of-way, or tidelands, or submerged lands owned by any city, . . . open or dedicated to public use, . . ." Respondent contends that the improvements sought to be made can only be constructed on easements

owned by the city, and that an easement for construction purposes only does not satisfy the requirements of section 5101.

Petitioner contends that the improvements could be constructed under the 1913 act, and that the 1913 act does not require that the improvements be on property or an interest therein which is owned by the city. In *County of Riverside* v. *Whitlock, supra,* it was apparently thought necessary to establish that the gas lines were in the public streets. (See 22 Cal.App.3d at pp. 881-882. See also *San Francisco S. Co.* v. *Contra Costa Co.* (1929) 207 Cal. 1, 5-6 [276 P. 570].)

In view of the disposition made of this case under part III of this opinion, it is unnecessary to determine to what extent an authorized governing body can construct improvements in a "construction easement" and assess the benefits to the lands benefited. So far as these proceedings are concerned the agreement and easement as alleged and admitted demonstrate that the project has no direct benefit other than to the college district itself, and as such the assessment cannot be justified as part of a general plan to benefit the lands of the college district along with those of other lands within the city by improvements in, or on property in which the city, as distinguished from the college district, has the dominant interest.

The alternative writ of mandate is discharged and the peremptory writ of mandate is denied.

Molinari, P. J., and Elkington, J., concurred.

A petition for a rehearing was denied April 14, 1972, and the following opinion was then rendered:

**THE COURT.—** ██ In a petition for rehearing the city for the first time suggests that a junior (community) college district is not subject to the debt limitation provisions of article XIII, section 40, of the state Constitution. ██ "The courts have on numerous occasions declared that they will not grant rehearings on points newly urged in the petition. It is the duty of counsel to see that all points are properly presented in the original briefs or argument, before submission." (Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 598, p. 4526.) ██ Nevertheless, it may simply be pointed out that the contention has no merit. The provisions "No . . . board of education or school district shall incur any indebtedness" etc. were originally enacted in article XI, section 18, in the Constitution of 1879. It was not until 1926 with the adoption of section 14 of article IX that the Constitution

mentioned "junior college" districts. That section reads, "The Legislature shall have power, by general law, to provide for the incorporation and organization of school districts, high school districts, and junior college districts, of every kind and class, and may classify such districts." Nevertheless, the conclusion that junior or community college districts are not school districts within the constitutional restraint is unwarranted. In 1917, long before the 1926 amendment, section 1720 of the Political Code was amended to read as follows: "The secondary schools of the state shall be designated as high schools, technical schools, and junior colleges. . . ." (Stats. 1917, ch. 304, § 1, p. 463.) Similar provisions are now embraced in section 5552 of the Education Code. Section 25422.5 provides: "Except as otherwise provided in this code, the powers and duties of community college boards are such as are assigned to high school boards." Section 1011 which applies to the governing boards of all school districts recognizes the constitutional limitation. It is unnecessary to belabor the point by reference to numerous other provisions of the Education Code which indicate that a junior or community college district is a school district under the general state system of public instruction. Moreover it may be noted that since the Legislature has so treated junior college districts, the constitutional limitation has been twice reenacted by amendment in 1926 and by renumbering in 1970.

The city also requests that the opinion be given prospective force only because some *"thirty odd"* assessment proceedings of similar nature have been conducted throughout the state and many millions of dollars in assessment bonds have been sold to private persons all across the United States. If various attorneys, as alleged, have had the temerity to approve the validity of such proceedings in the absence of a controlling precedent when there are readily available proceedings such as these through which to test that validity, they must bear the consequences of their action. To hold otherwise would be to recognize that the constitutional provision only extended as far as the retained counsel, rather than the court, said it did. It is incomprehensible to one who is familiar with the necessity of legal approval of public bond issues, and the provisions for validating suits and validating acts that such a state of affairs could have been permitted to occur.

Other grounds for rehearing which relate to conclusions of fact and law set forth in the opinion raise no grounds for reconsideration. .

Petitioner's application for a hearing by the Supreme Court was denied May 31, 1972. Peters, J., was of the opinion that the petition should be granted.